MURDOCK, Justice.
Lexington Insurance Company and Chartis, Inc. (hereinafter referred to collectively as “Lexington”), appeal from an order of the Winston Circuit Court appointing a third arbitrator to the arbitration panel established to settle a dispute between Lexington and Southern Energy Homes, Inc. (“SEH”).[1] We reverse and remand.

*1192
I. Facts and Procedural History

SEH designs and builds manufactured homes in Winston County. From January 1, 2002, through October 31, 2004, SEH purchased from Lexington three commercial general-liability (“CGL”) policies. An endorsement to a CGL policy insuring SEH from January 1, 2002, through December 31, 2002 (“the 2002 policy”), provides that SEH is responsible for a $100,000 self-insurance retention (“SIR”) “per occurrence.” Endorsements to two successive CGL policies that together provided coverage to SEH through October 31, 2004, provide that SEH is responsible for a $250,000 SIR per occurrence. The SIR applies both to costs of defense incurred by SEH and to amounts SEH pays in settlement or pursuant to a judgment.
The 2002 policy contains the following arbitration clause:
“Notwithstanding the Service of Suit clause above, in the event of a disagreement as to the interpretation of this policy, it is mutually agreed that such dispute shall be submitted to binding arbitration before a panel of three (3) Arbitrators, consisting of two (2) party-nominated (non-impartial) Arbitrators and a third (impartial) Arbitrator (hereinafter ‘umpire’) as the sole and exclusive remedy.
“The party desiring arbitration of the dispute shall notify the other party, said notice shall include the name, address, and occupation of the Arbitrator nominated by the demanding party. The other party shall within 30 days following receipt of the demand, notify in writing the demanding party of the name, address, and occupation of the Arbitrator nominated by it. The two (2) Arbitrators so selected shall within 30 days of the appointment of the second Arbitrator, select an umpire. If the Arbitrators are unable to agree upon an umpire, each Arbitrator shall submit to the other Arbitrator a list of three (3) proposed individuals from which list each Arbitrator shall choose one (1) individual. The names of the two individuals chosen shall be subject to a draw, whereby the individual drawn shall serve as umpire.
“The parties shall submit their case to the panel by written and oral evidence at a hearing time and place selected by the umpire. Said hearings shall be held within thirty (30) days of the selection of the umpire. The panel shall be relieved of all judicial formality, shall not be obligated to adhere to the strict rules of law or evidence, shall seek to enforce the intent of the parties hereto and may refer to, but are not limited to, relevant legal principles. The decision of at least two (2) of the three (3) panel members shall be binding and final and not subject to appeal except for grounds of fraud or gross misconduct by the Arbitrators. The award issued will be within 30 days of the close of the hearings. Each party shall bear the expenses of its designated Arbitrator and shall jointly and equally share with the other the expense of the umpire and the arbitration proceeding.
“The arbitration proceeding shall take place in or in the vicinity of Boston, Massachusetts.... The procedural rules of this arbitration shall, except as provided otherwise herein, be in accordance with the Commercial Rules of the American Arbitration Association.”
(Emphasis added.) The SIR endorsement to the 2002 policy contains an arbitration clause that reads exactly the same as the *1193 arbitration clause in the body of that policy, except that it does not contain a forum-selection clause and it states at its conclusion that “[a]ll other terms, exclusions, and conditions of this policy remain unchanged.”
CGL policies insuring SEH from January 1, 2003, through October 31, 2003 (“the 2003 policy”), and from November 1, 2003, through October 31, 2004 (“the 2004 policy”), each contain an arbitration clause identical to the arbitration clause contained in the body of the 2002 policy. The SIR endorsements to the 2003 policy and the 2004 policy do not contain arbitration clauses.
From January 1, 2002, through October 31, 2004, SEH was named as a defendant in 46 lawsuits alleging property damage and personal injury resulting from SEH’s using a vinyl-on-gypsum product in the homes it manufactured (“the VOG litigation”). SEH gave notice of these lawsuits to Lexington. Further, on October 2, 2009, SEH gave written notice to Lexington that SEH had exhausted its SIR amounts in the VOG litigation and was entitled to reimbursement of $1,039,859.74 from Lexington. More than 120 days passed without SEH receiving a decision from Lexington as to whether it agreed with SEH’s claim for this amount. On February 4, 2010, SEH made an arbitration demand pursuant to the arbitration clauses of the CGL policies, including the SIR endorsement to the 2002 policy.[2] SEH’s arbitration demand stated: “The subject policy was issued and delivered to [SEH] in Addison, Alabama. Accordingly, Addison, Alabama, shall serve as the site of the subject arbitration.”
In the arbitration demand, SEH also identified its non-impartial arbitrator in accordance with the procedure provided in the arbitration clauses: G. Thomas Sullivan, a Birmingham attorney. On March 4, 2010, Lexington identified its non-impartial arbitrator: Robert H. Gaynor, a Boston attorney. Pursuant to the arbitration clauses, the non-impartial arbitrators were to select a third, impartial arbitrator called the “umpire.” That selection did not occur, and the trial court issued an order appointing the umpire. That order is the subject of this appeal.
As noted above, the arbitration clauses provide that the two non-impartial arbitrators “shall within 30 days of the appointment of the second Arbitrator, select an umpire.” On April 1, 2010, Sullivan wrote a letter to Gaynor that included required disclosures and stated as follows:
“I believe that we are to select the umpire called for by the arbitration clause within thirty (30) days of your appointment, which I understand occurred by letter dated March 4, 2010. I would be glad to discuss any suggestions you might have. Alternatively, if you think it would be more efficient, we can just proceed by each designating three potential arbitrators from which the other selects one, with the umpire being drawn from those two. Please advise me how you wish to proceed. I look forward to working with you.”
On April 2, 2010, Gaynor left a voice mail for Sullivan stating that he soon would be forwarding his list of three nominees to serve as umpire, along with his required disclosures, and advising Sullivan that he understood from the arbitration clauses in the CGL policies that the venue *1194 for arbitration would be Boston. Sullivan responded with another letter on April 5, 2010, in which he offered the names of his three nominees to serve as umpire, and added the following:
“As to venue of the arbitration, I believe that there is another arbitration clause in a rider to the policy which I believe is the provision under which [SEH] is proceeding. That said, however, I would suggest that venue is an issue for the parties to resolve as opposed to the arbitrators. In either case, I will review your designees upon receipt of your letter and we can discuss how to proceed from there with the umpire selection process.”
Three days later, on April 8, 2010, Sullivan sent a letter to the parties’ counsel and to Gaynor that provided, in pertinent part:
“This letter serves to confirm that the party nominated arbitrators (myself and Mr. Robert H. Gaynor) have failed to select an umpire within the time period set out in the Arbitration clause. This also confirms that on behalf of [SEH] I have timely nominated three persons to serve as umpire, but that I have not received nominees from the arbitrator nominated by [Lexington], As the Arbitration Agreement calls for the arbitration hearing to be conducted in this matter within thirty (30) days, it appears that a lapse in the selection process has occurred and the parties may wish to consider protecting their interest as they deem necessary.”
Later on the same day, April 8, SEH initiated a declaratory-judgment action in the Winston Circuit Court by filing a complaint seeking (1) a declaration that the venue of the arbitration proceeding should be based upon the absence of a forum-selection provision in the arbitration clause of the SIR endorsement to the 2002 policy; (2) a determination that Lexington had “forfeited its right to designate three nominees to serve as umpire because it failed to timely do so as required by the arbitration agreement”; and (3) the appointment by the trial court of an umpire pursuant to 9 U.S.C. § 5 of the Federal Arbitration Act (“the FAA”). It is undisputed that SEH did not initiate service of the complaint upon Lexington at the time it was filed.
On April 9, 2010, unaware of the pending declaratory-judgment action, Gaynor sent Sullivan a letter reiterating his view that the venue for the arbitration proceedings was Boston and expressing the concern that, “without addressing the locus of the arbitration, the appointment process for an umpire is premature.” Nonetheless, Gaynor provided in the letter the names of his three nominees to serve as umpire in the arbitration proceedings. Gaynor also addressed the issue of a “lapse” mentioned by Sullivan in his April 8, 2010, letter:
‘You also mention in your April 8 correspondence that an apparent lapse in the selection process has occurred. Notwithstanding the list of three proposed umpires provided herein, my reading of the policies’ respective arbitration provisions is that the two, party-nominated arbitrators have 30 days from the appointment of the second arbitrator to select an umpire.
“In the event you and I are unable to agree upon an umpire, the arbitration clause provides that the swapping of the ‘lists of three’ begins. I do not read this process to be included in the 30-day timeframe to select an arbitrator. Nevertheless, again, I provide my list of three umpires above.”
On April 12, 2010, after having received Gaynor’s April 9 letter, SEH filed a “Motion for Expedited Hearing under Ala. R. *1195 Civ. P. 57 and to Appoint Arbitrator under 9 U.S.C. § 5.” SEH faxed a copy of this motion to Lexington on April 12, thereby apprising Lexington for the first time of the action pending in the Winston Circuit Court. Later that day, Lexington filed a motion to dismiss the complaint, arguing that the trial court lacked the authority to appoint an umpire and that, at most, the trial court could order the parties to proceed with arbitration in accordance with the terms of the arbitration clauses.
On April 13, the trial court set a hearing date of April 16 for SEH’s motion for an expedited hearing and the appointment of a third arbitrator. On April 15, 2010, Lexington filed a special appearance for the purpose of alleging insufficiency of process, insufficiency of service of process, and lack of due process.
At the hearing on April 16, 2010, the trial court offered to settle the parties’ dispute about naming an umpire, but each party declined to name the nominee from the other party’s list from which the name of the umpire would be drawn. Specifically, Lexington’s counsel stated that he did not have authority from Lexington to proceed at that time, and SEH openly questioned the impartiality of one of Lexington’s nominees for umpire and stated that it needed more time to investigate the backgrounds of Lexington’s other nominees. The trial court orally declined to rule upon SEH’s motion and ordered SEH to serve its complaint on Lexington.
On June 28, 2010, SEH filed a brief in support of its motion and a response to Lexington’s motion to dismiss. In its brief, SEH contended that two of Lexington’s nominees for umpire should not be allowed to serve in that role because, SEH contended, they were biased. SEH argued that by failing to submit impartial nominees in a timely fashion Lexington had caused a “breakdown in the arbitrator selection process” that required the trial court to resolve the “impasse” by appointing the umpire to the arbitration panel. For much of its argument, SEH relied upon a written, but unsworn, “declaration” from a professor of business law and dispute resolution at Indiana University, Stephen L. Hayford. On August 7, 2010, Lexington filed a motion to strike Hay-ford’s “declaration.” On August 9, 2010, SEH filed its response to Lexington’s motion to strike.
The trial court subsequently held a hearing on all pending motions and thereafter entered an order providing, in pertinent part:
“After reviewing the legal briefs submitted, all evidentiary material submitted and hearing oral argument of counsel regarding the matters at issue, this Court hereby declares that an impasse has occurred in the performance of the selection of the neutral umpire under the arbitration agreement, of which timing was of the essence, requiring this court to exercise its appointment power under 9 U.S.C. § 5 of the FAA, and appoint an arbitrator from the potential umpires provided by the parties, of whom no inference or evidence of bias has been brought before this court.
“Now, therefore, it is considered, ordered, adjudged, and decreed that [Lexington’s] motions to dismiss are hereby denied and pursuant to 9 U.S.C. § 5, Gusty Yearout is hereby appointed to serve as the neutral umpire in the arbitration proceedings between the parties.” [3]
Following receipt of this order, Lexington filed a petition for a writ of mandamus in this Court and a motion to stay proceed *1196 ings in the trial court pending a ruling on the petition. In response to Lexington’s petition, this Court issued an order, providing, in part:
“The petition for writ of mandamus to be directed to the Honorable John Hodges Bentley, Judge of the Circuit Court of Winston County, Alabama, having been filed and it appearing to the Court that the petition for writ of mandamus was filed from an order which is appealable according to Rule 4(a)(1), Alabama Rules of Appellate Procedure,
“IT IS ORDERED that the petition for writ of mandamus is treated as a timely notice of appeal.”
We also granted Lexington’s motion to stay proceedings in the trial court pending disposition of the appeal.

II. Jurisdiction and Standard of Review

Although acknowledging this Court’s order providing that Lexington’s petition for the writ of mandamus would be treated as an appeal, SEH asks this Court to revisit the question whether Lexington has properly invoked our jurisdiction. SEH maintains that the interlocutory order of the trial court appointing an umpire is not appealable under the FAA or under Rule 4(a)(1) or 4(d), Ala. R.App. P. Specifically regarding Rule 4, SEH contends that the order appealed from does not fall -within any of the categories of orders listed in Rule 4(a)(1) and that it is not an order granting or denying a motion to compel arbitration as contemplated by Rule 4(d).
In Okay v. Murray, 51 So.3d 285 (Ala.2010), we considered an appeal from a similar order. Specifically, as we do in the present case, we considered in that case an order of a trial court “compelling [one party] to arbitrate [its] dispute with [the other party] before an arbitrator appointed by the trial court, in contravention, [the first party] says, of the manner agreed to by the parties for selecting an arbitrator.” 51 So.3d at 288. Consistent with the treatment in Okay of the trial court’s order as an appealable order and with our previously issued order in this case, we treat the trial court’s order here as appealable and apply a de novo standard of review.

III. Analysis

The trial court based its authority to appoint the umpire for the arbitration proceedings between Lexington and SEH upon § 5 of the FAA, which provides:
“If in the agreement provision be made for a method of naming or appointing an arbitrator or arbitrators or an umpire, such method shall be followed; but if no method be provided therein, or if a method be provided and any party thereto shall fail to avail himself of such method, or if for any other reason there shall be a lapse in the naming of an arbitrator or arbitrators or umpire, or in filling a vacancy, then upon the application of either party to the controversy the court shall designate and appoint an arbitrator or arbitrators or umpire, as the case may require, who shall act under the said agreement with the same force and effect as if he or they had been specifically named therein; and unless otherwise provided in the agreement the arbitration shall be by a single arbitrator.”
9 U.S.C. § 5 (emphasis added).
The first observation to be made regarding § 5 — and one that ultimately is dispositive of the issues presented in this case — is the following: Although § 5 provides for the contingency of judicial intervention in the event of a “lapse in the naming of an arbitrator,” it does so only in the context of a “mandate[ ] that the method set forth in the arbitration agreement *1197 [for appointing an arbitrator] be followed.” Ex parte Cappaert Manufactured Homes, 822 So.2d 385, 387 (Ala.2001). As this Court has observed:
‘“Arbitration is a matter of contract. AT & T Tech., Inc. v. Communications Workers of America, 475 U.S. 643, 648 ... (1986). ... Parties to an arbitration agreement may determine by contract the method for appointment of arbitrators. The FAA expressly provides that where a method for appointment is set out in the arbitration agreement, the agreed upon method of appointment “shall be followed.” 9 U.S.C. § 5.
[[Image here]]
“Brook v. Peak Int'l, Ltd., 294 F.3d 668, 672-73 (5th Cir.2002).
“This Court has recognized the right of a party to an arbitration agreement to require that the method for selecting the arbitrator or arbitrators set forth in the arbitration agreement be followed and has reversed trial court orders that changed the contractually prescribed method of selecting the arbitrator. Ex parte Cappaert Manufactured Homes, 822 So.2d 385 (Ala.2001); BankAmerica Housing Servs. v. Lee, 833 So.2d 609 (Ala.2002); Ex parte Southern United Fire Ins. Co., 843 So.2d 151 (Ala.2002); Northcom, Ltd. v. James, 848 So.2d 242 (Ala.2002); and McDonald v. H & S Homes, LLC, 853 So.2d 920 (Ala.2003).”
Bowater Inc. v. Zager, 901 So.2d 658, 668 (Ala.2004) (emphasis added). This Court recently reversed a trial court’s order “appoint[ing] an arbitrator to preside over the proceedings resolving a dispute” because the arbitrator was appointed “in contravention of the method for selecting that arbitrator agreed to by the parties.” Okay, 51 So.3d at 291.
Consistent with the foregoing observation, Lexington argues that the arbitration clauses in the CGL policies and the SIR endorsement prescribe certain procedures for the selection of arbitrators, that it acted in compliance with those procedures, and, accordingly, that the trial court had no basis under § 5 of the FAA for intervening in the selection process.
SEH responds by arguing that the trial court correctly concluded that Lexington, or Gaynor on its behalf,[4] had not followed the contractually agreed-upon procedures for selecting an arbitrator and that, therefore, there had been a “lapse in the naming of [the] arbitrator” that necessitated the trial court’s exercise of the appointment power under § 5 of the FAA. According to SEH, Lexington failed to act in accordance with the contractually agreed-upon selection procedures in two respects. First, SEH contends that Lexington was tardy in nominating its three candidates for the position of umpire. SEH also alleges bad faith on Lexington’s part in connection with its nomination of umpire candidates.

A. The Timing Issue

SEH’s first argument bears some similarity to the argument offered by the petitioners in Ex parte Cappaert Manufactured Homes, supra. Instead of a delay in the appointment process, the petitioners in Cappaert contended that there was an “impasse” in the selection of an arbitrator based on asserted inability of the parties to reach agreement on an arbitrator as required by their contract. The petitioners argued that this purported impasse *1198 amounted to a “lapse in the naming of an arbitrator” that justified “judicial intervention and appointment.” 822 So.2d at 387. This Court rejected the petitioners’ argument, explaining:
“We need not consider whether, or under what circumstances, an ‘impasse in the selection of an arbitrator’ amounts to a ‘lapse in the naming of an arbitrator [for purposes of § 5],’ because, at the time the trial court made its appointment in this case, there was no evidence indicating an ‘impasse.’
“Indeed, as of November 22, 2000, when the Buyers filed their ‘Motion for Court to Choose [an] Arbitrator,’ there was no factual basis for the allegation that, ‘despite their best efforts,’ the parties had ‘not been able to agree on an arbitrator.’ On the contrary, the correspondence between the parties as of that date revealed that the selection process was proceeding apace. To be sure, the Buyers had rejected the first proposed arbitrator. However, they did so summarily; they gave no reason for their rejection. Thus, there was no evidence from which to conclude that the parties had reached a deadlock....
“Thus, we hold, as a matter of law, that the unexplained rejection by the Buyers of the first arbitrator proposed by the manufacturer, under a provision requiring the concurrence of the Buyers in the manufacturer’s selection, does not constitute a lapse within the meaning of § 5 of the FAA.”
822 So.2d at 387.
Similar to the situation in Cappaert, at the time SEH filed its declaratory-judgment action seeking appointment of the third arbitrator by the trial court, the parties were in the midst of nominating their candidates for this post. Correspondence reveals that Sullivan had provided his list of nominees to Gaynor only three days earlier and that Gaynor provided his list of nominees to Sullivan just four days later (i.e., four days after Sullivan had done so and the day after the action was filed in the trial court and before Gaynor or Lexington was aware of that action). The only steps remaining in the process described in the arbitration clauses were the selection by Sullivan and Gaynor of one nominee from the other arbitrator’s nomination list and the drawing of one of the two resulting names to serve as the umpire. Perhaps more important than the temporal relationship of these events to the filing of the complaint itself, however, is the fact, as discussed below, that, at most, they were unfolding only a few days outside the allegedly applicable 30-day time frame.
SEH argues that Gaynor’s failure to provide his list of nominees within 30 days of Gaynor’s appointment by Lexington created a “lapse in the naming of an umpire” that empowered the trial court to make the appointment under § 5. Assessment of this argument requires that we first examine the contractual language used by the parties to describe the process for appointing a third arbitrator. As noted, that language is as follows:
“The party desiring arbitration of the dispute shall notify the other party, said notice shall include the name, address, and occupation of the Arbitrator nominated by the demanding party. The other party shall within 30 days following receipt of the demand, notify in writing the demanding party of the name, address, and occupation of the Arbitrator nominated by it. The two (¾) Arbitrators so selected shall within 30 days of the appointment of the second Arbitrator, select an umpire. If the Arbitrators are unable to agree upon an umpire, each Arbitrator shall submit to the other Arbitrator a list of three (3) proposed individuals from which list each *1199 Arbitrator shall choose one (1) individual. The names of the two individuals chosen shall be subject to a draw, whereby the individual drawn shall serve as umpire.”
(Emphasis added.)
Both parties contend that this language is plain and unambiguous, but, predictably, each contends that it plainly and unambiguously means something different than the other party asserts. SEH contends that this language means the entire process of selecting the third arbitrator is to be accomplished within 30 days from the selection of the second arbitrator. It contends that the last two sentences are meant simply to describe the process the first two arbitrators are to use in order to accomplish this task if they are unable to accomplish it by mutual agreement. In contrast, Lexington contends that the last two sentences describe the next phase in the process in the event there has not been a selection of an umpire by mutual agreement within the designated 30-day period.
For purposes of deciding this particular case, we need not decide which interpretation of this language is correct or whether that interpretation is or is not a function of plain and unambiguous contractual language. Even if SEH’s interpretation is correct, Lexington would be due to prevail in light of the minimal nature of any delay on its part in nominating candidates to serve as umpire.
This Court has quoted with approval the decision of the United States Court of Appeals for the Fifth Circuit in Brook v. Peak International, Ltd., 294 F.3d 668, 672-73 (5th Cir.2002).
“‘(“[I]n order to enforce an arbitration award, the arbitrator must be chosen in conformance with the procedure specified in the parties’ agreement to arbitrate.”). However, “a ‘trivial departure’ from the parties’ agreement [ ] may not bar enforcement of an award.” ’ ”
Bowater Inc., 901 So.2d at 668 (quoting Brook v. Peak Int’l, Ltd., 294 F.3d at 673, quoting in turn R.J. O’Brien & Assocs., Inc. v. Pipkin, 64 F.3d 257, 263 (7th Cir.1995)). Consistent with the decision of the Fifth Circuit Court of Appeals in Brook, we are clear to the conclusion that Lexington’s alleged delay under SEH’s interpretation of the contract was minimal under the circumstances and did not warrant judicial intervention that preempted the umpire-selection process agreed to by the parties.
Our conclusion that SEH was not justified in so quickly seeking judicial intervention based on a strict interpretation of the applicable 30-day provision is bolstered in this particular case by (though not dependent upon) the fact that, if Lexington was tardy in nominating its three candidates for umpire, so apparently was SEH. Lexington appointed Gaynor on March 4, 2010. For all that appears from the terms of the parties’ contract, the prescribed 30-day period therefore ended on April 3, 2010. Sullivan submitted his list of umpire nominees on behalf of SEH on April 5 — 2 days after that 30-day mark. Gaynor submitted his list of umpire nominees 4 days later — on April 9 — or 6 days after the deadline.[5]
*1200 Our conclusion in this case would be less certain if, in fact, as the trial court found, “time was of the essence” in regard to the arbitrator-selection deadlines in the arbitration clauses in the policies Lexington issued to SEH.
“ ‘It is an axiom of equity that as a general rule time is not of the essence of a contract. Gay v. Tompkins, 385 So.2d 973 (Ala.1980). However, the parties might make time essential by “clear manifestation of the intent of the parties in the contract itself, by subsequent notice from one party to the other, by laches in the party seeking to enforce it, or by change in the value of the land or other circumstances which would make a decree for the specific performance inequitable.” Isom v. Johnson, 205 Ala. 157, 158, 87 So. 548, 544 (192[0]) (quoting Barnard v. Lee, 97 Mass. 92 (1867)).’ ”
Joseph v. MTS Inv. Corp., 964 So.2d 642, 648-49 (Ala.2006) (quoting Moore v. Lovelace, 413 So.2d 1100, 1102 (Ala.1982)). No language in the arbitration clauses provides a manifestation of intent to make time of the essence.
SEH contends that the mere existence of a 30-day deadline for the appointment of an umpire demonstrates that time was of the essence in the arbitration clauses. This argument is contradicted, however, by the decision in Campania Portorafti Commerciale, S.A. v. Kaiser Int’l Corp., 616 F.Supp. 236 (S.D.N.Y.1985) — the very case SEH cites for support of the proposition that “a party loses its right of appointment under an arbitration agreement, even where the delay is minimal, where time is of the essence.” In Compañía, the court explained:
“The worst that can be said of respondent is that it sought to appoint its arbitrator, Mr. Berg, three calendar days and one business day after the May 9 deadline contained in the supplemental agreement of the parties evidenced by the telex of April 19. It further appears that the failure to make a timely appointment was inadvertent, and not for the purpose of delay or harassment. Respondent says that this *1201 is so, and there is no evidence upon which I could base a contrary inference.
“There is substantial authority for the proposition that so minor a delay, uncomplicated by indications of bad faith, does not in equity deprive a party to an arbitration clause of its contracted-for right to appoint an arbitrator of its choosing. Texas Eastern Transmission Corp. v. R.L. Barnard, 285 F.2d 536 (6th Cir.1960); Lobo & Co. v. Plymouth Navigation Co. of Monrovia, 187 F.Supp. 859 (S.D.N.Y.1960); In re Utility Oil Corp., 10 F.Supp. 678 (S.D.N.Y.1934). These cases hold that minimal delays in appointing an arbitrator do not deprive the defaulting party of its right of appointment unless the contract makes time of the essence. The simple recitation of the time within which the appointment must be made is not sufficient, under these cases, to achieve that characterization. ”
616 F.Supp. at 238 (emphasis added).[6] Even assuming that the arbitration clauses in the present case imposed a 30-day deadline for the appointment of an umpire, we cannot conclude that this fact in itself provides a sufficient basis on which to conclude that “time was of the essence.”
In several of the above-cited cases, a delay of only a few days in the appointment of an arbitrator was not sufficient to warrant a conclusion that there had been a lapse in the selection process that justified a judicial appointment. See also, e.g., Global Reinsurance Corp.-U.S. Branch v. Certain Underwriters at Lloyd’s, London, 465 F.Supp.2d 308, 311 (S.D.N.Y.2006) (concluding that “[t]he mere six days between the time Global notified London Reinsurers of its objections to [an umpire nominee of London Reinsurers] and the time [Global] filed the instant Petition [requesting that the trial court appoint the umpire] cannot be characterized properly as a ‘lapse’ that justifies judicial intervention”). Likewise, under the circumstances presented in this case, we cannot conclude that the alleged delay by Lexington in nominating candidates for the position of umpire was anything other than a minimal delay that did not justify judicial intervention at the time and of the nature achieved by SEH.

B. The Allegations of Bad Faith

We also have before us the issue whether the trial court could have concluded that a “lapse” in the naming of an umpire occurred as a result of Lexington’s alleged failure to have acted in good faith in the performance of its contractual obligations in relation to the selection of the umpire. SEH argues that Lexington committed “bad faith” in the umpire-selection process in two ways.
First, SEH argues that Gaynor’s statements in his correspondence with Sullivan that the dispute about the proper venue for the arbitration proceedings should be settled before the selection of the umpire constituted a bad-faith attempt by Lexington to delay the appointment process. The correspondence between Gaynor and Sullivan shows, however, that both of them discussed the venue issue and that Gaynor *1202 provided his list of umpire nominees despite his misgivings about the fact that the venue issue had not been settled. The correspondence also indicates that overall Gaynor was prompt in his responses to Sullivan’s communications. No evidence of bad faith by Lexington in this aspect exists in the record, and the trial court did not conclude otherwise.
Second, SEH alleges that Lexington committed bad faith in the umpire-selection process by nominating two individuals — Frank Puccio and Robert Curley— who SEH claims should be removed because they are biased. SEH cites one lower federal court decision in support of its position that, where bias is shown, a trial court may intervene in a contractually agreed-upon process for selecting an arbitrator. In Third, National Bank in Nashville v. WEDGE Group, Inc., 749 F.Supp. 851 (M.D.Tenn.1990), the court determined that a trial court may appoint a substitute arbitrator when “the potential bias of a named arbitrator makes arbitration proceedings a prelude to later judicial proceedings challenging the arbitration award.” 749 F.Supp. at 855.[7]
Lexington concedes that a party may challenge an arbitration award on the ground of “evident partiality” on the part of the arbitrator who entered it. Title 9 U.S.C. § 10(a)(2) provides, in pertinent part, that a federal district court “may make an order vacating the award upon the application of any party to the arbitration ... where there was evident partiality or corruption in the arbitrators, or either of them.” In tension with the authority cited by SEH, however, there is some authority for the view that challenges concerning allegations of bias on the part of an arbitrator are limited to the circumstance described in the statute (challenges *1203 to an actual award), though none of these cases appear to expressly address whether a party’s nomination or selection of an allegedly biased arbitrator can rise to a level that would constitute a breach of an implied covenant of good faith in the fulfillment of contractual obligations regarding the appointment process. See, e.g., Gulf Guar. Life Ins. Co. v. Connecticut Gen. Life Ins. Co., 304 F.3d 476, 490 (5th Cir.2002) (explaining that “the FAA does not expressly endorse court inquiry into the capacity of any arbitrator to serve prior to issuance of an arbitral award”); Florasynth, Inc. v. Pickholz, 750 F.2d 171, 174 (2d Cir.1984) (observing that “[t]he Arbitration Act does not provide for judicial scrutiny of an arbitrator’s qualifications to serve, other than in a proceeding to confirm or vacate an award, which necessarily occurs after the arbitrator has rendered his service”); Marc Rich & Co., A.G. v. Transmarine Seaways Corp. of Monrovia, 443 F.Supp. 386, 388 n. 3 (D.C.N.Y.1978) (stating that “[n]o section of the [FAA] ... provides for judicial scrutiny of an arbitrator’s qualifications in any proceeding other than an action to confirm or vacate an award. If Congress had wished to authorize such review before arbitration proceedings commence, it could easily have so provided.”).
For purposes of this case, we assume that a court may intervene to appoint an arbitrator before an award is made when “evident partiality” on the part of a named arbitrator as contemplated by 9 U.S.C. § 10(a)(2) is shown. This assumption, however, does little to advance SEH’s cause. SEH makes no argument regarding “evident partiality” on the part of a named arbitrator because, as of yet, there is no named arbitrator in this case. Instead, SEH’s argument is that the selection process itself “lapsed” because Lexington acted in “bad faith” with respect to the contractually agreed-upon process for nominating a third arbitrator.
Assuming for the sake of argument that a contractually agreed-upon process for selecting an arbitrator may be considered to have “lapsed” as a result of a party’s bad-faith efforts to comply with that process, we cannot conclude that such bad faith has been demonstrated in the present case. Among other things, SEH has cited no authority in either the trial court or in this Court for a legal standard to be applied in determining whether a party has acted either in “good faith” or in “bad faith” in nominating a candidate to serve as an arbitrator. The only case cited by SEH in its discussion of the merits of this issue is Waverlee Homes, Inc. v. McMichael, 855 So.2d 493 (Ala.2003). Waverlee Homes, however, differs from the present case in several ways.
First, Waverlee Homes differs from the present case factually. The facts indicating bias in Waverlee Homes involved a secret deal between plaintiffs counsel and a settling defendant as to the selection of the arbitrator. Furthermore, there was evidence that the arbitrator had acted as cocounsel with the purchaser’s attorney on a similar case and that the arbitrator had made very similar rulings in other cases brought against mobile-home manufacturers by the same attorney. Finally, the purchasers did not submit any evidence to contradict the assertions.
The claims against Curley and Puccio in the present case differ markedly from those leveled against the arbitrator in Waverlee Homes. SEH claims that Cur-ley is biased because his
“resumé reads like a ‘Who’s Who Among Insurance Defense Lawyers.’ Curley was the Massachusetts ‘Defense Lawyer of the Year in 2004’; a Member of the Massachusetts Defense Lawyers Association; a Member and state representa *1204 tive for the Defense Research Institute; a Member and one-time Director (2003) and Vice President of the Insurance Coverage Committee of the International Association of Defense Counsel; an Associate Member of the Defense Counsel of Trial Lawyers of America; and a Member of the Insurance Law Library.”
SEH claims that Puccio is biased because his law firm had engaged in some representation of Lexington insureds in the past, because he once represented an insured in a case in which AIG Insurance, Lexington’s parent company, was the excess carrier, and because his firm biography states that he excels in obtaining “defense verdicts.”
Most of, though not all, the unsworn assertions against Curley are undisputed. Be that as it may, we find noteworthy the observation of the United States Court of Appeals for the Second Circuit in Morelite Construction Corp. v. New York City District Council Carpenters Benefit Funds, 748 F.2d 79 (2d Cir.1984):
“On the one hand, parties agree to arbitrate precisely because they prefer a tribunal with expertise regarding the particular subject matter of their dispute .... Familiarity with a discipline often comes at the expense of complete impartiality. Some commercial fields are quite narrow, and a given expert may be expected to have formed strong views on certain topics, published articles in the field and so forth. Moreover, specific areas tend to breed tightly knit professional communities. Key members are known to one another, and in fact may work with, or for, one another, from time to time. As this Court has noted, ‘[expertise in an industry is accompanied by exposure, in ways large and small, to those engaged in it....’ Andros Compania Maritima, S.A. v. Marc Rich & Co., 579 F.2d 691, 701 (2d Cir.1978).”
748 F.2d at 83. Comparing the different contexts in which arbitrators and judges serve and the resulting importance of the role of disclosure relative to that of recusal in the selection of arbitrators, the court in Schmitz v. Zilveti, 20 F.3d 1043 (9th Cir.1994), observed that “[ejxpert arbitrators will nearly always, of necessity, have numerous contacts within their field of expertise.” 20 F.3d at 1046 (citing Commonwealth Coatings Corp. v. Continental Cas. Co., 393 U.S. 145, 150, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968) (White, J., concurring) (“It is often because they are men of affairs, not apart from but of the marketplace, that [arbitrators] are effective in their adjudicatory function.”)).[8]
As to SEH’s allegations regarding Puc-cio, the trial court apparently received into evidence without objection a letter from Lexington’s counsel to SEH’s counsel explaining that, “on rare occasions,” Puccio’s law firm had represented an insured of Lexington, but that “Mr. Puccio himself has never represented a primary insured of Lexington or AIG.” Neither side in this *1205 case is more specific with their allegations as to this representation. Lexington also confirmed that “[t]here was one matter that Mr. Puedo handled where AIG was the excess carrier for the client he represented,” but that, “[i]n that case, AIG eventually utilized other counsel, chosen and paid for by AIG, in relation to the excess coverage.” Lexington explained that Puedo has never represented Lexington or its holding company Chartis, Inc., as an entity in an insurance-coverage dispute or otherwise. Finally, it is noteworthy (and undisputed) that, in response to SEH’s complaints regarding the nomination of Puccio, Lexington offered to submit a fourth nominee to give SEH an additional choice for umpire; SEH, however, refused this offer.
Waveries Homes also differs from the present case with respect to the legal issue presented. Waveriee Homes involved a challenge to an actual award by a named arbitrator. It was not a case of alleged bad-faith performance by a party of its contractual obligations with respect to a nominating process, and it did not set forth a standard that governs the evaluation of such claims, nor for that matter did it address the more general question of whether and under what circumstances a court may intervene in the arbitrator-selection process.
In Waverlee Homes, this Court surveyed federal cases brought after the arbitrator had been named and after the arbitrator had made an actual award. 855 So.2d at 503-08. In most, if not all, of these federal cases, the issue was whether the arbitrator had failed to make a pre-selection disclosure of facts that might have demonstrated bias or a conflict of interest on his part and whether this nondisclosure itself demonstrated an “evident partiality” on the part of the arbitrator under 9 U.S.C. § 10(a)(2) so as to justify the vacatur of the resulting arbitration award. The opinion in one of these cases, Schmitz v. Zilveti, supra, provides a helpful explanation of the distinction between what have become known as “nondisclosure” cases and “actual bias” cases:
“Appellants argue that Commonwealth Coatings Corp. v. Continental Cas. Co., 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968), requires us to reverse the district court. In Commonwealth Coatings, one arbitrator on a panel of three failed to disclose that he had engaged in periodic and significant business relations with one of the parties to the arbitration over the previous five or six years. Id. at 146, 89 S.Ct. at 338.... The party that lost the arbitration then challenged the award, asserting that the failure of this arbitrator to disclose his significant business relationship resulted in ‘evident partiality’ under 9 U.S.C. § 10[ (a)(2) ], warranting vaca-tur of the award.
“The district court held that ‘the arbitrator ... was entirely fair and impartial,’ id. at 151 n. *, 89 S.Ct. at 340 n. *, and refused to vacate the award. Without disturbing the finding that the arbitrator was not biased, id. at 147-50 & 151 n. *, 89 S.Ct. at 338-40 & 340 n. *, the Supreme Court reversed and vacated the award. The Court held that an arbitrator’s nondisclosure of facts showing a potential conflict of interest creates evident partiality warranting vaca-tur even when no actual bias is present. The Court tried to articulate a standard indicating what facts show evident partiality when not disclosed by an arbitrator. The Court described facts that must be disclosed as those that ‘might create an impression of possible bias,’ id. at 149, 89 S.Ct. at 339, those that show the ‘appearance of bias,’ id. at 150, 89 S.Ct. at 340, and those that indicate that arbitrators ‘might reasonably be thought *1206 biased against one litigant and favorable to another,’ id.”
20 F.3d at 1045 (emphasis added).
After noting that two of its previous decisions had “involved allegations of actual bias rather than a failure to disclose,” 20 F.3d at 1046, the Schmitz court additionally explained:
“How to apply Commonwealth Coatings in a nondisclosure case is an issue of first impression in the Ninth Circuit. Other courts facing the same issue have held that ‘evident partiality’ is present when undisclosed facts show ‘a reasonable impression of partiality.’ [Middlesex Mut. Ins. Co. v.] Levine, 675 F.2d [1197] at 1201 [ (11th Cir.) ]; see Sanko S.S. Co. v. Cook Indus., Inc., 495 F.2d 1260, 1263-64 (2d Cir.1973).... Consistent with Commonwealth Coatings, courts examining nondisclosure cases have not required proof of actual bias in showing ‘evident partiality.’ See Levine, 675 F.2d at 1200-02; Sanko S.S. Co., 495 F.2d at 1263-64.
[[Image here]]
“Though Toyota of Berkeley [v. Automobile Salesman’s Union, Local 1095, 834 F.2d 751 (9th Cir.1987),] and [Sheet Metal Workers International Ass’n v.] Kinney Air[, 756 F.2d 742 (9th Cir.1985),] provide some support for the proposition that Commonwealth Coatings establishes ‘reasonable impression of partiality’ as a legal standard, both the facts and factual analyses of those cases are inapposite to the instant nondisclosure case. Both involve allegations of actual bias rather than evident partiality from failure to disclose. Toyota of Berkeley, 834 F.2d at 756-57; Kinney Air, 756 F.2d at 746. Moreover, both opinions distinguish their facts from those of nondisclosure cases, including Commonwealth Coatings. Toyota of Berkeley, 834 F.2d at 756; Kinney Air, 756 F.2d at 746.
“Notwithstanding the factual dissimilarity of Toyota of Berkeley and Kinney Air with nondisclosure cases, both Toyota of Berkeley and Kinney Air employ the ‘reasonable impression of partiality’ standard taken from Commonwealth Coatings, a nondisclosure case. Toyota of Berkeley, 834 F.2d at 756-57; Kinney Air, 756 F.2d at 746; see also Employers Ins. [of Wausau v. National Union Fire Ins. Co. of Pittsburgh ], 933 F.2d [1481,] at 1481 [ (9th Cir.1991) ]; [Sheet Metal Workers Int’l Ass’n, Local No. 162 v.] Jason Mfg.[, Inc.], 900 F.2d [1392] at 1392 [(9th Cir.1990)]. That these actual bias cases apply the Commonwealth Coatings standard to allegations of actual bias is confusing. In an actual bias case, a court must find actual bias. Finding a ‘reasonable impression’ of partiality is not equivalent to, nor does it imply, a finding of actual bias. Otherwise, the Commonwealth Coatings court could not have held that a reasonable impression of partiality was present when no actual bias was shown.
“The policies of 9 U.S.C. § 10 also support the notion that the standard for nondisclosure cases should differ from that used in actual bias cases. In a nondisclosure case, the integrity of the process by which arbitrators are chosen is at issue. Showing a ‘reasonable impression of partiality’ is sufficient in a nondisclosure case because the policy of section 10(a)(2) instructs that the parties should choose their arbitrators intelligently. Commonwealth Coatings, 393 U.S. at 151, 89 S.Ct. at 340 (White, J., concurring). The parties can choose their arbitrators intelligently only when facts showing potential partiality are disclosed. Whether the arbitrators’ decision itself is faulty is not necessarily relevant. But in an actual bias determination, the integrity of the arbitrators’ decision is directly at issue. That a *1207 reasonable impression of partiality is present does not mean the arbitration award was the product of impropriety.”
20 F.3d at 1046-47 (emphasis added).
It is not clear whether Waverlee Homes, itself, was a “nondisclosure” case or an “actual bias” case. Although the facts as described in the opinion suggest an “actual bias” case, the Court concluded its opinion with an endorsement of the “reasonable impression” standard articulated in the federal “nondisclosure” cases it had surveyed.[9]
What Waverlee Homes clearly was not, however, was a “bad-faith” case. That is, unlike the present case, Waverlee Homes was not a case in which a party to an arbitration agreement claimed a § 5 “lapse” in the contractually agreed-upon process for selecting an arbitrator on the ground that the other party to the contract had breached an implied covenant of good faith in the performance of its contractual obligations with respect to that selection process. Accordingly, Waverlee Homes is of limited value to this Court insofar as articulating a guiding legal standard in what may be referred to as a “bad-faith” case.
It is safe to say, however, that, in a case in which a party to an arbitration agreement complains that the facts concerning a candidate for arbitrator are so bad that the very act of nominating that candidate rises to the level of bad faith, something more must be proven than merely facts, the conscious nondisclosure of which by the selected arbitrator ultimately is determined to demonstrate “evident partiality” on the part of that arbitrator. Nor in such a case would it be enough merely to prove facts that, in the final analysis, are deemed to provide a basis for finding that the arbitrator was actually biased. The ultimate determination of partiality on the part of the arbitrator, if partiality exists, is not the issue in such a case. The issue is whether the party nominating that candidate was acting in bad faith even to nominate that candidate. Accordingly, the “something more” that must be provided in order to establish such bad faith logically would have to include, at a minimum, proof that the nominating party, when making or pursuing the nomination, was actually aware of the underlying facts and also knew to some degree of certainty (exactly how much being an issue not necessary to this decision) that such facts were disqualifying in nature, yet proceeded to make the nomination anyway. In a case based solely on nondisclosure, this logically would mean that the nominating party must have been aware at the time of the nomination that such nondisclosure would occur.
In the present case, however, one may question whether, in all fairness, we can say that the arbitrator nominees failed to make required disclosures under circumstances from which a negative inference should be drawn. None of the candidates had yet been named as the third arbitrator, much less begun service, without mak *1208 ing disclosures of the affiliations at issue. In point of fact, there was little or no chance for the candidates nominated by Lexington to disclose anything before SEH filed an action claiming that the nomination process had lapsed and put the parties in an adversarial posture with respect to that process.[10]
Furthermore, Curley and Puccio do not appear to have made any effort to conceal the information in question. To the contrary, most, if not all, of it was made known to SEH by virtue of its publication for public consumption on Web sites sponsored by Curley and Puccio and their respective law firms.
Even if it could be said that Curley or Puccio failed to make some more specific disclosure at a time he should have done so, that it not the question here. The question is whether Lexington acted in bad faith even to nominate such person. To that end, there simply has been no showing that Lexington made or pursued the nomination of either candidate with an awareness that the candidate would fail to disclose material information relevant to his ability to be fair in the event he was selected to serve. Likewise, if the underlying issue is actual bias on the part of Curley or Puccio, there has been no showing that Gaynor made these nominations on behalf of Lexington with an awareness of facts he knew would disqualify either of them from service if selected. Additionally, when SEH contended that disqualification was appropriate, Lexington offered to nominate an additional candidate from which SEH could select.
For purposes of deciding this particular case, we find it appropriate to consider the totality of the factual and procedural circumstances presented, including the timing of and the procedural circumstances within which SEH chose to raise its bad-faith claims, the underlying facts concerning Curley and Puccio, and the offer Lexington made before the selection process had been completed to provide SEH with an additional choice for umpire. Under these circumstances, and in the absence of any legal standard requiring a different conclusion, we simply cannot find in this case adequate support for a conclusion that Lexington was guilty of bad faith that caused the contracted-for selection process to lapse. At the time and under the circumstances that the trial court acted, judicial intervention to appoint the umpire was not warranted.

IV. Conclusion

For all the foregoing reasons, we conclude that the order from which Lexington appeals in this case was entered in error. That order is hereby reversed and the cause remanded.
REVERSED AND REMANDED.
MALONE, C.J., and STUART, MAIN, and WISE, JJ., concur.
WOODALL, BOLIN, PARKER, and SHAW, JJ., concur in the result.

. According to Lexington, Chartis, Inc., is a "holding company" owned by Lexington Insurance Company. SEH contends that Chartis, Inc., is "Lexington's claims handling office and holding company.” The parties disagree as to whether SEH makes any *1192 claims against Chartis, Inc., in its underlying breach-of-contract and bad-faith action that is the basis of arbitration. This dispute is immaterial to the outcome of the present appeal.

. Lexington insists that an arbitrable dispute does not exist because it has not responded to SEH’s claims under any of the CGL policies. SEH counters that it considered Lexington's delay in responding to its claim submissions to be a "constructive denial” of those claims. That dispute is not before us in this appeal.

. Yearout was one of the nominees on the list Sullivan had provided to Gaynor.

. The parties assume for the purpose of analyzing the issues presented in this case that the actions of the first two arbitrators, Gaynor and Sullivan, may be imputed to Lexington and SEH, respectively. For purposes of our analysis, we do likewise.

. SEH insists, however, that Sullivan submitted his list of umpire nominees in a timely fashion because April 3, 2010, was a Saturday, and Sullivan submitted his list on the next business day, Monday, April 5, 2010. SEH claims that arbitration agreements ordinarily follow the same rule applied in the Federal Rules of Civil Procedure, i.e., that weekends and holidays are not counted in filing deadlines. SEH's only authority for this argument, however, is the unsworn “declaration” of business law professor Stephen Hayford, in which he states, without citation to any authority, that "[b]y long-standing, *1200 consistent custom and practice in commercial arbitration, contractual time periods are never deemed to toll on a Saturday, Sunday, or a holiday.”
We note that SEH’s claim is contrary to the rules of contract construction. “It is black-letter law that arbitration agreements must be enforced according to general standards of contract law.” Cook's Pest Control, Inc. v. Boykin, 807 So.2d 524, 526 (Ala.2001).
"Where there is no indication that the terms of the contract are used in a special or technical sense, they will be given their ordinary, plain, and natural meaning. See Ex parte Dan Tucker Auto Sales, Inc., 718 So.2d 33, 36 (Ala.1998). If the court determines that the terms are unambiguous (susceptible of only one reasonable meaning), then the court will presume that the parties intended what they stated and will enforce the contract as written.”
Homes of Legend, Inc. v. McCollough, 776 So.2d 741, 746 (Ala.2000). In other words, in a contract — and therefore in an arbitration agreement — 30 days means 30 days unless the contract provides some other indication. Particularly in an agreement between sophisticated business entities, if a deadline did not include weekends and holidays it is reasonable to assume that that would be stated. See, e.g., Certain Underwriters at Lloyd’s London v. Argonaut Ins., 500 F.3d 571, 581 (7th Cir.2007) (concluding that the “parties are to be bound to the explicit language of arbitration clauses, with no state-specific exceptions that would extend otherwise clear contractual deadlines. Of course, sophisticated commercial parties such as these may provide by contract that thirty days does not include Sundays and holidays, or that a contract with a terminus for performance on a Sunday or holiday (as recognized by some identifiable body — state, federal or otherwise) may be timely performed on the next business day.”).

. See also New England Reinsurance Corp. v. Tennessee Ins. Co., 780 F.Supp. 73 (D.Mass.1991), in which the court stated:
"Counsel for the plaintiff has stated in an affidavit that the eight day (six business day) delay in appointing the plaintiff's arbitrator was not due to bad faith. The plaintiff’s counsel’s lack of diligence in transmitting his letter of appointment does not rise to a level sufficient to deprive the plaintiff of its right to appoint an arbitrator, especially considering the lack of prejudice to the defendant_ Moreover, nothing indicates that the parties intended time to be of the essence.”
780 F.Supp. at 77 (footnote omitted).

. SEH also cites Gayley Mill Corp. v. Princeton Rayon Corp., 17 Misc.2d 594, 185 N.Y.S.2d 899 (N.Y.Sup.1959). In Gayley Mill Corp., the trial court appointed an arbitrator for a party only after that party had twice designated arbitrators who failed to qualify under the impartiality requirements expressed in the resettlement judgment entered by the trial court two years earlier. The resettlement judgment required each party to designate an arbitrator who would not have “ ‘any connection or association with either party or their attorneys which would disqualify a person from being a juror.' " 17 Misc.2d at 595, 185 N.Y.S.2d at 901. The trial court refused to allow Princeton Rayon Corp. ("Princeton”) to designate a third arbitrator because
“[wjhen the extended litigation over the arbitrability of the controversy was brought to an end by the resettled judgment of December 26, 1956, the court unquestionably intended that the parties should proceed with dispatch before the arbitrators so that the dispute could be determined without further delay in the spirit of a true arbitration. The qualifications of the arbitrators were prescribed in terms too clear to admit of mistake or misunderstanding. Yet, Princeton[,] by designating successively two arbitrators, neither of whom met these qualifications, has completely frustrated the court’s purpose. Since the facts constituting the disqualification were necessarily known to Princeton, its course cannot be regarded as other than a willful obstruction of the arbitration. Two years have gone by and because of Princeton's two abortive designations the parties are today no nearer the determination of the controversy by the arbitrators than they were when the resettled judgment was entered on December 26, 1956. If effect is to be given to the judgment, the court must itself now designate the arbitrator whom Princeton, despite full opportunity, has failed to designate. Unless this course is taken, as Gayley prays, there may never be a proper designation. By making the designation the way will be cleared for the arbitration to proceed in accordance with the terms and intent of the resettled judgment. ”
17 Misc.2d at 596-97, 185 N.Y.S.2d at 902-03. Thus, the trial court in Gayley Mill Corp. appointed an arbitrator to ensure the intended execution of its own earlier judgment. The court did not invoke or rely upon § 5 of the FAA in doing so.

. Counsel for SEH also would have this Court conclude that Curley is biased because he represents General Electric Company. Counsel for SEH asserts in the brief filed in this Court that General Electric "is owned by Lexington's parent, AIG [Insurance]." Counsel cites this Court to no evidence indicating that General Electric is a subsidiary of AIG, nor has this Court been able to locate any evidence to support this claim, either within or without the record. (Although we do not imply that, had we located such “evidence” outside the record, we could rely upon it, Lexington asks us to take judicial notice of the fact that counsel's assertion is simply untrue and that certain publications identify General Electric as the world’s 13th largest corporation in 2010 and AIG Insurance as the world's 41st largest corporation.) The claim that General Electric “is owned by AIG” merits no further discussion.

. The Court concluded its analysis in Waverlee Homes as follows:
“[Tjhe weight of authority developed after Commonwealth Coatings [Corp. v. Continental Casualty Co., 393 U.S. 145 (1968),] requires a review of the offered evidence pursuant to the ‘reasonable impression of partiality’ standard .... The appropriate approach for the trial court to take in assessing Waverlee's allegations that [the arbitrator] was biased or partial in his arbitration of the underlying dispute is to consider whether Waverlee makes a showing through admissible evidence that the court finds to be credible, that gives rise to an impression of bias that is direct, definite, and capable of demonstration, as distinct from a 'mere appearance’ of bias that is remote, uncertain, and speculative.”
855 So.2d at 508.

. SEH filed its original complaint alleging lapse on related grounds on April 8, 2010, the day before Gaynor, unaware of the pending action, submitted his list of nominees. In addition, the facts pertaining to Curley and Puccio, in stark contrast to the facts concerning the arbitrator in Waverlee Homes, were publicly available information. Indeed, SEH found out this information in a matter of days following the filing of its complaint, during a period that saw a rapid exchange of correspondence and court filings by which the dispute between the parties erupted. It was in the midst of these exchanges that SEH acquired information about Curley and Puccio from publicly accessible Web sites published by Curley and Puccio themselves and by their respective law firms.