BOLIN, Justice.
Municipal Workers Compénsation Fund, Inc. (“the Fund”), appeals from the Jefferson Circuit Court’s order denying the Fund’s motion to vacate a judgment entered on an arbitration award. We reverse and remand.
7. Facts and Procedural History
The Fund is a nonprofit corporation that administers a self-insured group workers’ compensation fund for the benefit of its members, which comprise approximately 624 municipalities and governmental organizations in Alabama. The purpose of the Fund is to provide affordable workers’ compensation .insurance to its members, who contribute to the Fund by paying premiums. The Fund entrusted the management and investment of approximately $50 million in assets to Morgan Asset Management, Inc. (“MAM”), and Morgan Keegan & Company, Inc. (“Morgan Kee-gan”). MAM served as an investment ad-visor for'-a managed account and certain mutual funds owned by the Fund. Morgan Keegan served as the broker-dealer for the Fund’s managed account and had the authority as the broker-dealér to execute transactions in that account as directed by the Fund. A second account at. Morgan Keegan held the mutual funds that had been sold to the Fund-through a Morgan Keegan broker.
*899 The Fund states that it directed MAM and Morgan Keegan.to invest its funds conservatively and that it relied on MAM and Morgan Keegan for sound financial advice and management. However, according to the Fund, MAM and Morgan Keegan disregarded this mandate by rec-' ommending that the Fund purchase and hold what the Fund says were unsuitable investments, by overconcentrating the Fund’s assets in investments that had undue exposure to the sub-prime mortgage market and in other risky investments, and by misrepresenting and failing to disclose material facts pertaining to the investments. The Fund claims that it sustained losses in excess of $15 million in 2007 and 2008 as a result of the actions of MAM and Morgan Keegan. .
On May 28, 2009, the Fund initiated arbitration proceedings against MAM and Morgan Keegan by filing a statement of claim with' the Financial Industry Regulatory Authority (“FINRA”) pursuant to the arbitration provision contained in its contracts with MAM and Morgan Keegan. The Fund asserted claims of breach of fiduciary duty; breach of contract; negligence; fraud; violations of NASD and NYSE Rules; and violations of the Alabama Securities Act;
The arbitration provisions contained in the Fund’s contracts with MAM and Morgan Keegan provided that arbitration was to be conducted before FINRA in accordance with that organization’s rules and procedures. As part of the standard FIN-RA arbitration proceedings, the parties were required to submit “Uniform Submission Agreements,” which provided that the parties understood and agreed that the arbitration would be conducted in accordance with the “FINRA By-Laws, Rules, and Code of Arbitration Procedure.”
The FINRA Rules contain specific procedures regarding the selection of an arbitrator. Included within those procedures are rules requiring disclosure by the arbitrator. Rule 12405 provides:
“(a) Before appointing arbitrators to a panel, the Director will notify the arbitrators of the nature of the dispute and the identity of the parties. Each potential arbitrator must make a reasonable effort to learn of, and must disclose' to the Director, any circumstances which might preclude the arbitrator from rendering an objective and impartial determination in the proceeding, including:
“(1) Any direct or indirect financial or personal interest in the outcome, of the arbitration;
“(2) Any existing or past financial, business, professional, family, social, or other relationships or circumstances with any party, any party’s representative, or anyone who the arbitrator is told may be a witness in -the proceeding, that .are likely to affect impartiality or might reasonably create an appearance of partiality or bias;
“(3) Any such relationship or circumstances involving members of the arbitrator’s family or the 'arbitrator’s current employers, partners, or business associates;
[[Image here]]
“(b) The obligation to disclose interests, relationships, or circumstances that might preclude an arbitrator from rendering an objective and impartial determination described' in paragraph (a) is a continuing duty that requires an arbitrator who accepts appointment to an arbitration proceeding to disclose, at any stage of the proceeding, any such interests, relationships, or circumstances that arise, or are recalled or discovered.”., ..
Pursuant to FINRA’s arbitrator-disclosure requirements, arbitrators submit detailed biographical information when they submit an application to join FINRA’s roster of *900 arbitrators. This biographical information is compiled to create an arbitrator-disclosure report. During the arbitrator-selection process, the parties are given the opportunity to review a potential arbitrator’s disclosure report. The parties depend on the information contained in the arbitrator-disclosure reports as part of the process of selecting a panel of arbitrators. In order to ensure that the arbitrator-disclosure reports are accurate and current, FINRA provides the arbitrators with their disclosure reports each time an arbitrator is appointed to a case. FINRA’s Arbitrator Guide provides, in part:
“It is extremely important that arbitrators update their Disclosure Reports frequently....
“Arbitrator disclosure is the cornerstone of FINRA arbitration, and the arbitrator’s duty to disclose is continuous and imperative. Disclosure includes any relationship, experience and background information that may affect — or even appear to affect — the arbitrator’s ability to be impartial and the parties’ belief that, the arbitrator will be able to render a fair decision. When making disclosures, arbitrators should ■ consider-an aspects of them professional and personal lives and disclose all ties between the arbitrator, the parties and the matter in dispute, no matter how remote they may seem. If you need to think about whether a disclosure is appropriate, then it is: make the disclosure.”
FINRA’s arbitrator-disclosure requirements" áre designed to provide the arbitrating parties with an honest, unbiased adjudicatory process, and FINRA “strongly encourages arbitrators to make a wide variety of disclosures [and] ... when in doubt, always err in favor of making a disclosure,” because meeting the disclosure requirement is part of an “arbitrator’s overarching duty ... to preserve the integrity and fairness-' of the arbitral process.” FINRA arbitrators also receive a FINRA arbitrator’s manual, which states that “[i]t is extremely important that the [arbitrator-disclosure] profile be completed accurately-and updated periodically.”
Once an arbitrator is selected to serve on a case, FINRA forwards to the arbitrator information regarding the case, including the names of the parties, the names of the parties’ representatives, and the nature of the case; the oath of arbitrator, which includes the arbitrator-disclosure checklist; and" the case materials, which include the pleadings, disclosures óf the other arbitrators selected, and the witness list. The arbitrator is obligated to review these materials and to perform a conflicts check. Only after these case materials have been reviewed, the disclosure checklist completed, and a conflicts check performed should the arbitrator sign the oath of arbitrator.
On November 16, 2009, FINRA provided the Fund, MAM, and Morgan Keegan with a list of 30 proposed arbitrators for the parties’ pending arbitration from which they were to select a panel of 3 arbitrators by using a systems of “ranks” and “strikes” based on the arbitrator-disclosure reports, which were also provided to the parties. The final panel of arbitrators appointed consisted of William Julavits (chairperson), Patricia Dewitt (public panelist), and Eric Kunis (non public/securities-industry panelist).
On March 26⅛ 2012, the parties received Julavits’s disclosure checklist. Included in the checklist was question 11, which appeared within the checklist section entitled “Subject Matter Disclosures,” Question 11(A) specifically asked:
“Have you, your spouse, or an immediate family member been involved in a dispute involving the same or similar subject matter as the arbitration?”
Julavits answered “No.” Question 11(B) asked:
*901 “Did the dispute assert any of the same allegations as the assigned arbitration, even if- the dispute was not securities related?”
Julavits answered “NA,” i.e., not applicable.
According to the Fund, at the time Ju-lavits answered questions 11(A) and 11(B), he was the recent subject of five lawsuits alleging tort claims, including breach of fiduciary duty, misrepresentation, and negligence, which are the same claims the Fund has asserted against MAM and Morgan Keegan. Four of the five lawsuits were still pending at the time the. Fund’s ease was set to be heard by the arbitration panel.
. Kunis confirmed in his oath that he had reviewed the arbitrator-disclosure checklist and that he had nothing to disclose; As mentioned above, Rule 12405(a)(2) and (3) of the FINRA Rules requires disclosure of “[a]ny existing or past financial, business, professional ... relationships or circumstances with any party ... that are likely to affect impartiality or might reasonably create an appearance of partiality or bias” and “any such relationship or circumstances involving ... the arbitrator’s current employers, partners, or business associates.” The “Confiicts/Disclo-sures” section of the arbitrator application specifically asks: “In the last five years, has your employer/firm had a business relationship with any brokerage firms?”
Additionally, included in the disclosure checklist under the section “Personal Dis-J closures” were questions 1 and 2, which specifically asked:
“1. Have you had any professional, social, or other relationships or interactions with counsel for any of the parties in this arbitration or their law firms?
“2. Have you had any professional, social, or other relationships or -interactions with any of the parties or-their employers in the arbitration?”
Kunis has been since 2002 a vice president/partner in Maxim Group, LLC, a financial-services firm. According to the Fund, Maxim -Group had a close, ongoing, and material relationship with Morgan Keegan- arid its counsel at the time of the arbitration proceeding in this case, which Kunis -failed to reveal in the oath of arbitrator, the arbitrator application, or the disclosure checklist.
The Fund’s underlying action proceeded to an arbitration hearing, and, on August 1, 2012, the three-person arbitration panel issued its award, denying all of the Fund’s claims in their entirety. On September 14, 2012, the trial court entered a judgment based on the arbitration award.
- On September 21, 2012, the Fund moved the trial court to vacate its judgment based on the arbitration award. The Fund alleged that, after the, arbitration award was entered in this case, it, discovered that Julavits -and Kunis had failed to disclose material and relevant .-information during the arbitrator-selection, process. The Fund stated that Julayits failed to disclose at any time, and actively concealed, the fact that he was a. defendant in five lawsuits alleging against him claims substantially similar- -. to. those asserted by the Fund against MAM and Morgan Keegan. The Fund explained that Julavits had been named as a third-party defendant in five separate actions filed in 2011 in Beaufort County, South Carolina, seeking to recover damages for the devaluation and decreased marketability of. real property and equity interests in club memberships associated with that real property. The Fund stated that the South Carolina claims- sought damages from Julavits in his capacity as a board member of the Callawassie- Island Members Club (“CIMC”). Certain members of CIMC alleged that CIMC, through its board members, made false statements to them concerning the value of their prop *902 erty at Callawassie Island and the value of their equity interests in certain club memberships. The CIMC members also.-alleged that the board members owed certain fiduciary duties to them and that the board members had breached those fiduciary duties. The CIMC members claimed that the alleged misrepresentations and breaches of fiduciary duties by the board members caused the value of their memberships to be greatly diminished. The South Carolina'actions were dismissed in the summer of 2012.
The Fund argued that the.South .Carolina claims against Julavits were “strikingly” similar to the claims asserted by it against MAM and. Morgan Keegan in that it had alleged that MAM and Morgan Kee-gan had made material misrepresentations and had breached certain fiduciary duties owed it regarding the Fund’s investment accounts and that those alleged misrepresentations and breaches of fiduciary duties caused the Fund to suffer substantial investment losses. The Fund argued that Julavits, in “complete and utter disregard” for' the FINRA disclosure requirements, never disclosed to the parties his involvement in the recent similar litigation and, when specifically asked whether he had ever been involved in litigation with “similar allegations .. even if not securities related,” affirmatively responded that he had not. • • ft - -. ■
As for Kunis, the Ftmd claimed that he had failed to make the required disclosure of his firm’s relationship with Morgan Kee-gan and its counsel. The Fund alleged: (1) that Maxim Group had been a co-underwriter with Morgan Keegan on approximately 36 multi-millibn-dollar equity and debt issuances, (2) that Maxim Group and Morgan Keegan had been codefen-dants in a number of lawsuits, including lawsuits filed by investors to recover losses in securities underwritten by ■ Maxim Group and Morgan Keegan; (3) that Maxim Group had a past and ongoing attorney-elient relationship with Greenberg Traurig, the-law firm representing Morgan Keegan in the arbitration proceeding; and (4) that Kunis failed to disclose Maxim Group’s involvement with the investment product at. issue in ¡this case. The Fund argued that'the FINRA Rules placed a duty on Kunis to make a reasonable effort to learn of and then to disclose “any existing or past financial, business, professional, ,., or other relationships or circumstances with any party ,.. that áre likely to affect impartiality or might reasonably create an appearance of partiality or bias” and “any such relationship or circumstance involving the arbitrator’s ... business associates.” The Fund contended that Kunis had failed to disclose the existence of his firm’s relationship with Morgan Keegan in the oath of arbitrator, the arbitrator application, and the disclosure checklist.
The Fund argued in its motion to vacate the judgment entered on the arbitration award that both Julavits and Kunis had failed to fully disclose' certain facts and relationships as required by the FINRA Rules and that, because Julavits and Kunis had failed to make full disclosures under the FINRA Rules, it was entitled to have the arbitration award vacated pursuant to 9 Ú.S.C. § 10(a)(1) through (4) and § 6-6-14, Ala.Code .1975, a provision in the Alabama Arbitration Act.
■ Following a hearing on the Fund’s motion to vacate, the trial court, on December 18, 2012, entered an order denying the Fund’s motion. The trial court found that both Julavits and Kunis had failed to make required disclosures and-that the failures to make -the. disclosures was “contrary to the spirit of all . of the FINRA Rules and guidelines.” However, the trial court further concluded that, although Julavits and Kunis had failed to make the disclosures required by the FINRA Rules, those fail *903 ures to disclose did not amount to an “evident partiality” on the part of the arbitrators, i.e., an “impression of bias that is direct, definite, and- capable of demonstration,” because to determine that the failures did amount to bias, the trial court would have been required to speculate as to the existence of bias stemming from the relationships between the arbitrators and the facts and circumstances they failed to disclose to the Fund. See Waverlee Homes, Inc. v. McMichael, 855 So.2d 493, 508 (Ala.2003). Specifically, the trial court made the following findings of fact and conclusions of law:
“Arbitrator disclosure is the ‘cornerstone’ of FINRA arbitration. The arbitrator’s duty to disclose is continuous and imperative, and it includes any relationship, experience, and background information that may affect — or even appear to affect — the arbitrator’s ability to be impartial. The FINRA Guide further instructs potential arbitrators that, in making théir disclosures, ‘arbitrators should consider all aspects of their professional and personal lives and disclose all ties between the arbitrator, the parties and the matter in dispute, no matter how remote they may seem. If - you need to think about whéther a disclosure is appropriate, then it is: make the disclosure.’ This principle is repeated on the next page of the FINRA-Guide: ‘As a rule, when in doubt, always err in favor of making a disclosure.’
“Further, pursuant to- FINRA Rule 12405, each potential arbitrator ‘must make a reasonable effort to learn of, and must disclose .-.. (2) Any existing or past financial, business, professional, family, social, or other relationships or circumstances with any party [or] party’s representative ... that are likely to affect impartiality or might reasonably create an appearance of partiality or bias; (3) [a]ny such relationship or circumstances involving ... the arbitrator’s current employers, partners, or business associates.’ ■
[[Image here]]
“On March 26, 2012, the parties received from FINRA additional disclosures made by Julavits. Under the heading ‘Subject Matter Disclosures,’ Question 11(A) of the Disclosure Checklist asked:
“.‘Have you, your spouse, or an immediate family member been involved in a dispute involving the same or similar subject matter as .the arbitration?’
“Jplavits answered ‘No’ to this question. Question 11(B) then asked: .
“ ‘Did the dispute assert any of the same allegations as the-assigned arbitration, ■ even if the . dispute was not securities related?’ .
“Julavits answered this question by marking ‘NA,’ or ‘not applicable.-’
“It is undisputed that Julavits was named as a third-party defendant in five related cases in South Carolina (‘South Carolina Litigation’) involving a dispute over the alleged disparate treatment of certain members of an equity-membership golf and social club located on Cal-lawassie Island, South Carolina, related to unpaid membership' dues. [The Fund] alleges that Julavits should have disclosed his involvemént in these suits, and that his failure to do so constitutes evident partiality under §, U.S.C. § 10(a)(2). [The' Fund] further .alleges that, had it been aware of Julavits’s involvement in these suits, it would have exercised its rights to have him removed from the arbitration panel.
[[Image here]]
“As a threshold issue, this court finds that Julavits should have disclosed his involvement in the South parolina Litigation in questions, 11A and llB .of the Disclosure Checklist,- nr otherwise in his disclosures. This is the only reasonable *904 and logical finding considering FINRA’s unwavering emphasis on an arbitrator’s disclosure of all aspects of their professional and personal lives, no matter how remote they may seem. However, this court is not persuaded by the [Fund’s] argument that an arbitrator’s .failure to disclose equates to a per se showing of evident partiality under 9 U.S.C. § 10(a)(2). Rather, this court has examined whether Julavits’s nondisclosure gives rise to an impression of bias that is direct, definite, and capable of demonstration, as distinct from a mere appearance of bias that is remote, uncertain, and speculative. See Waverlee Homes, Inc. [v. McMichael], 855 So.2d [493] at 508 [ (Ala.2003) ].
“The facts alleged in Waverlee clearly gave rise to an impression of bias that is direct and identifiable. The facts in this case are not as definitive. The subject matter of the arbitration involved the large-scale investment of funds into alleged high-risk securities. . The lawsuits against Julavits involved a dispute over country club dues , wherein some members received reimbursements while others did not. The gravamen of the South Carolina litigation is different from that in the arbitration. However, some of the causes of action alleged against Ju-lavits in the South Carolina Litigation are the same as alleged against [MAM and Morgan Keegan] in the arbitration.
“Julavits should have disclosed the .South Carolina Litigation to allow the parties the opportunity to consider its significance in making their selection. It is possible that Julavits’s defense of causes of action similar to those at issue in the arbitration may have resulted in commensurate favoritism toward the defendants in this case. However, it seems overreaching to find that there exists an impression of bias that is direct, definite, and capable of demonstration. Rather, any such finding - would require this court to speculate that there existed a definite impression of bias because of Julavits’s involvement in the South Carolina'lawsuits. For that reason, the court finds no evident partiality on the part of Julavits. Likewise, the court finds that vacatur is not warranted under any of the other prongs of 9 U.S.C. § 10(a), as a result of Julavits’s failure to disclose the South Carolina Litigation.
[[Image here]]
“Since 2002, Kunis has been a Vice President and partner in the financial services firm Maxim Group, LLC. There, Kunis is a broker and financial advisor. Other employees and partners at Maxim are involved in securities underwriting. Maxim is a relatively small investment firm with approximately three hundred fifty (350) employees. Kunis served as the non-public/securities industry arbitrator on the panel.
“[The Fund] alleges that, ‘at the time of the arbitration. hearing and undisclosed by Kunis at any time, Kunis’s firm had a close, on-going and material relationship with [Morgan Keegan] and its counsel which was required to be disclosed.’ Specifically, [the Fund] alleges that Kunis failed to disclose (1) that Maxim and [Morgan Keegan] were co-underwriters on ‘no fewer than 36 issuances’ of securities; (2) that Maxim and [Morgan Keegan] were co-defendants in two lawsuits filed by investors to recover losses in securities underwritten by Maxim and [Morgan Keegan]; (3) that [Morgan Keegan’s] counsel in the arbitration proceeding, Greenberg Traurig, had represented Maxim in its capacity as underwriter on at least eight securities issuances; (4) that Maxim regularly underwrote, managed, or distributed securities that were the same or extremely similar to the unique securities at issue in the arbitration; and (5) *905 that some of the securities underwritten, managed, or distributed by Maxim were actually owned by [the .Fund] by virtue of its investments with [Morgan Kee-gan] and MAM.
“[The Fund] further alleges that, had [it] been aware of these undisclosed relationships, ‘[the Fund] would have exercised all of its rights to prevent Kunis from serving on the panel.’ [Morgan Keegan] counters that there is no evidence that Kunis knew of the undisclosed relationships between Maxim and [Morgan Keegan], or Maxim and Green-berg Traurig. Further, [Morgan Kee-gan] argues that the relationships are so distant, trivial, and immaterial so as to fail to demonstrate evident partiality.
“The FINRA Arbitrator’s Manual (‘Manual’) instructs that:
“ ‘An arbitrator is required to disclose ... any existing or past financial, business, [or] professional ... relationships that are likely to affect impartiality. Persons requested to serve as arbitrators should disclose any such relationships that they have with any party or its counself;] ... [t]hey should also disclose any such relationship involving ... their current or former émployers, partners; or business associates.’
“The Manual further instructs the arbitrators that, even ‘[i]f the arbitrator does not believe a conflict exists, but rather some association with the parties, counsel, and/or witnesses may be questioned, the arbitrator must disclose the association. When in doubt, disclosure should be the rule.’
“In addition to the emphasis it places on full and candid disclosure, FINRA imposes on potential arbitrators a duty to investigate the existence of possible or potential conflicts; FINRA Rule 12405 (stating that' arbitrators ‘must make a reasonable effort to learn of and must disclose any circumstances which might'«reate an appearance of bias). The ‘Conflicts/Disclosures’ section of the FINRA Arbitrator Application specifically inquires, ‘[i]n the last five years, has your employer/firm had a business relationship with any brokerage firms? Provide details.’
“Reading this question in conjunction with FINRA Rule 12405, this court finds that Kunis was required to make a reasonable effort to determine, whether his employer, Maxim, had any type of business relationship with [Morgan Keegan] or MAM prior to his acceptance of appointment to the arbitration panel.
“Had Kunis known of these'relationships, this court finds that the informa-, tion should have been disclosed to the parties. However, as discussed in the findings related to Julavits’s non-disclosure, the failure to disclose is not, in and of itself, a per se showing of evident partiality under 9 U.S.C, § 10(a)(2), and does not aütomatically warrant dismissal under any of the other prongs of 9 U.S.C. § 10(a).', This court is not persuaded that constructive notice, wherein Kunis ‘should have known’ of Maxim’s relationships with [Morgan Keegan] and Greenberg Traurig, should be treated as actual notice for purposes of imparting bias on Kunis. It does appear to this trial court .that, had a basic conflict check been conducted by Kunis, the relationships between Maxim and [Morgan Keegan], and possibly between Maxim and Greenberg Traurig, would have been revealed.. The relationship would presumably have then been disclosed, and considered by all parties in making their selections. However, there can be no reasonable impression of bias that is definite, direct, and capable of demon-station where, as here, there is no evidence that Kunis even knew of the disclosed business relationship.
*906 “There -is no allegation that Maxim ever received compensation from [Morgan Keegan]. In . addition, Kunis was the securities panelist. His experience in that industry is presumably what made him qualified to serve-in that capacity. The undisclosed relatiqnships are not so. close and influential as to create an impression of bias that is direct, definite, and capable of demonstration. Again, any such finding would be premised on an ‘appearance of bias,’ and would require this court to speculate as to the existence of bias stemming from ■the relationships. Likewise, this court does not find sufficient grounds for vaca-tur under the other prongs of 9 U.S.C. § 10(a), based on Kunis’s non-disclosure.” .
The Fund appeals.

II. Standard of Review

This Court has stated:
“In R.P. Industries, Inc. v. S & M Equipment Co., 896 So.2d 460 (2004), this Court reviewed the trial court’s order granting a motion to confirm an arbitration award and denying the opposing party’s motion to vacaté that award. We stated:
“‘“Where parties, as in this case, have, agreed that disputes should go to arbitration, the role of the courts in reviewing the arbitration award is limited, Transit Casualty Co. v. Trenwick Reinsurance Co., 659 F.Supp. 1346 (S.D.N.Y.1987), Affirmed, 841 F.2d 1117 (2d Cir.1988); Saxis Steamship Co. v. Multifacs International Traders, Inc., 375 F.2d 577 (2d Cir. 1967). On motions to confirm or to vacate an award, it is not the function of courts to agree or disagree with the reasoning of the arbitrators. Application of States Marine Corp. of Delaware, 127 F.Supp. 943 (S.D.N.Y.1954).. Courts are only to ascertain whether there exists one of the- specific grounds for vacation of an award. Saxis Steamship Co. A court cannot set aside the - arbitration -award just because it disagrees with it; a policy allowing it to do so would undermine the federal policy of encouraging the settlement of disputes by arbitration. United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); Virgin Islands Nursing Association’s Bargaining Unit v. Schneider, 668 F.2d 221 (3d Cir.1981). An award should be vacated only where the party attacking the award clearly establishes one of the grounds specified [in 9 Ü.S.C. § 10]. Catz American Co. v. Pearl Grange Fruit Exchange, Inc., 292 F.Supp. 549 (S.D.N.Y.1968).’
“896 So.2d at 464 (quoting Maxus, Inc. v. Sciacca, 598 So.2d 1376, 1380-81 (Ala.1992)). The standard by which an appellate court reviews a trial court’s order confirming an..arbitration award under the Federal Arbitration Act is that questions of law are reviewed de novo and findings of fact are reviewed only for clear error. See. Riccard v. Prudential Ins. Co., 307 F.3d 1277, 1289 (11th Cir.2002).”
Hereford v. D.R. Horton, Inc., 13 So.3d 375, 378 (Ala.2009).

III. Discussion

A. The Evidentiary Issúes

The Fund argues on appeal that the judgment entered on the arbitration award is due to be vacated because Julavits and Kunis did not fully disclose the existence of certain facts. and relationships as required by the FINRA Rules. .However, as a threshold matter,.we must.first address the challenge.by MAM and Morgan Kee-gan to the evidence.prqsented by the Fund in support of its motion • to vacate the *907 judgment entered on the arbitration award.
•The Fund submitted a brief and a substantial amount of evidentiary materials in support of its motion to vacate the judgment. After MAM and Morgan Keegan filed responses in opposition to its motion to vacate, the Fund filed a reply in support of the motion to vacate, which was supported by additional exhibits. The Fund then supplemented its motion to vacate the judgment with supplemental evidence in the form of additional exhibits.
During the evidentiary hearing on the Fund’s motion to vacate the judgment, MAM and Morgan Keegan moved the trial court to strike the documents presented by the Fund in support of its motion to vacate. Specifically, MAM and Morgan Kee-gan objected to a majority of the documents on the ground that they were not properly authenticated or certified.[1] MAM and Morgan Keegan also objected to a couple of the documents on hearsay grounds. Although MAM and Morgan Keegan argued to the trial court that many of the documents had been printed from Internet Web sites, they have not disputed or challenged the actual contents of those documents.[2] The Fund responded to the motion to , strike the documents in support of its motion to vacate by contending that MAM and Morgan Keegan had waived the right to object to the documents by waiting until the day of the hearing on the motion to vacate, when they had had notice of the documents for approximately 30 to 45 days before the date of the hearing, The Fund also argued that the documents contained,an indicia of authenticity and thus were self-authenticating. The Fund requested that the trial court give it “an opportunity to respond” if the trial court found any of the documents offered in support of its motion to vacate to be “problematic.”
The trial court advised the parties that it would notify them if it wanted any additional briefing on the issue of the admissibility of the Fund’s documents. The trial court never expressly ruled on MAM and Morgan Keegan’s motion to strike the documents presented by the Fund in support of its motion to vacate. However, it appears that the trial court implicitly denied the motion to strike because the trial court relied on certain of the disputed documents in its order. See Moody v. Town of Weymouth, 805 F.2d 30, 31 (1st Cir.1986) (holding that “[t]he district court did not expressly rule on plaintiffs motion to strike, but implicitly denied it, for the court, in its opinion granting defendants’ motion to dismiss, relied on defendants’ materials”).
MAM and Morgan Keegan argue on appeal that the denial of the Fund’s motion to vacate is due to be affirmed because, they say, the Fund offered no admissible evidence in support of its motion — the documents it .presented in support of the motion, they argued, were either not properly authenticated or contained hearsay. MAM and Morgan Keegan contend, as they did in the trial court, that many of the documents offered in support of the motion to vacate had simply been -printed fr'om Internet Web sites. Again, we note that MAM and Morgan Keegan have not challenged the contents of the documents.
The .Fund initially argues that because MAM and Morgan Keegan failed to timely cross-appeal challenging the trial court’s denial of their motion to strike the *908 Fund’s evidentiary materials, those eviden-tiary issues are not before this Court. We disagree. In McMillan, Ltd. v. Warrior Drilling & Engineering Co., 512 So.2d 14, 24 (Ala.1986), this Court stated: “In the absence of taking an appeal, an appellee may not cross-assign as error any rulings of the trial court adverse to appellee.” However, in an opinion on rehearing, this Court rejected its prior holding that a cross-appeal was required in order to challenge an adverse ruling where the appellee was not seeking to enlarge his own rights under the order. This Court stated:
“Appellees on rehearing ask that we reexamine the question of whether they were required to file a cross-appeal in order to preserve for appellate review the question of whether summary judgment was properly granted on grounds other than those relied upon by the trial court. Appellees’ argument that no cross-appeal was required is well taken.
“We find that the proper rule is set forth by Professor Moore:
‘“[A]h appellee, though he files no cross-appeal or cross-petition, may offer in súpport of his judgment any argument that ⅛ supported by the record, whether it was ignored by the court below or flatly rejected. The classic statement of this principle appears in the opinion of Mr. Justice Brandéis, speaking for a unanimous Court in United States v. American Railway Express Co.[, 265 U.S. 425, at 435, 44 S.Ct. 560, at 564, 68 L.Ed. 1087 ] in 1924:
“ ‘ “[A] party who does not appeal from a final decree of the trial court cannot be heard in opposition thereto when the cáse is brought here by the appeal of the adverse party. In other words, the appellee may not attack the decree with a view either to enlarging his own rights thereunder or of lessening the rights of his adversary, whether what he seeks is to correct an error or to supplement the decree with respect to a matter pot dealt with below. But it is likewise settled that the appellee may, without, taking a cross-appeal, urge in support of a decree, any matter appearing in the record, although his argument may involve an attack upon the reasoning of the lower court or an insistence upon matter overlooked or ignored by it.”
“ ‘By 1937, this formulation was referred to by the Court as “inveterate and certain,” and it has been reiterated many times since then.’
“9 J.. Moore and B. Ward, Moore’s Federal, Practice ¶204.11[2] (2d ed.1985). None of the cases cited on original deliverance, for support of the opposite rule deals with this precise issue. In all of •.those cases, the appellee was attempting to argue for alteration of. the judgment to enlarge his rights. Under such circumstances, those cases correctly held that a cross-appeal must be filed. In this case, appellees merely seek to argue grounds other than those relied upon by the trial court that support the summary judgment and in no way seek any more than what they have already obtained.”
McMillan, Ltd., 512 So.2d at 25-26. Here, MAM and Morgan Keegan prevailed in the trial court and do not seek to have an “alteration' of the judgment to enlarge [their] rights.” Id. They simply argue for affirmance of the trial court’s order on an alternative ground that was presented to the trial court but that was not relied upon by the trial court. Accordingly, MAM and Morgán Keegan were not required to file a cross-appeal in this case in’ order to challenge the denial of their motion to strike the Fund’s, evidentiary materials.
MAM and Morgan Keegan have specifically challenged the admissibility of various documents introduced by the Fund in *909 support of its motion to vacate the judgment entered on the. arbitration award. This Court has stated:
“ ‘ “[T]he trial court has great discretion in determining whether evidence ... is relevant and whether it should be admitted or excluded.” Sweeney v. Purvis, 665 So.2d 926, 930 (Ala.1995). When evidentiary rulings of the trial court are reviewed on appeal, “rulings on the admissibility of evidence are within the sound discretion of the trial judge and . will not be disturbed on appeal absent an abuse of that discretion.” Bama’s Best Party Sales, Inc. v. Tupperware, U.S., Inc., 723 So.2d 29, 32 (Ala.1998), citing Preferred Risk Mut. Ins. Co. v. Ryan, 589 So.2d 165 (Ala.1991).’
“Bowers v. Wal-Mart Stores, Inc., 827 So.2d 63, 71 (Ala.2001).”
Van Voorst v. Federal Express Corp., 16 So.3d 86, 92 (Ala.2008). We address the admissibility of the challenged documents in turn.
1.. The “Declaration.of Page A. . Poerschke in Support of Motion to Vacate ”
In support of its motion to vacate the judgment entered on the arbitration award, the Fund submitted the “Declaration of Page A. Poerschke in Support of Motion to Vacate,” which was accompanied by 40 exhibits constituting over 3,000 pages. Poerschke, a lawyer representing the Fund, stated in the declaration that she was “competent to’ testify as to the truth of the matters set forth [therein] and could and would competently testify thereto from [her] own personal knowledge” and that the copies of the exhibits attached to the declaration were “true and correct.” Poerschke states in the declaration that, “as one of the attorneys of record, I was physically present during the entire [FIN-RA] arbitration hearing.” MAM and Morgan Keegan objected to the Poerschke declaration as an authenticating source for the exhibits ■ attached to ⅝ stating that Poerschke did not have the authority under the law to authenticate'.the exhibits offered in support of the motion to vacate.
“It is an established rule of evidence that, to admit any document into evidence over objection, the party offering the evidence must show that the document is genuine or authentic.” Hampton v. Bruno’s, Inc., 646 So.2d 597, 599 (Ala.1994). Indeed, Rule 44, Ala. R. Civ. P., which addresses the form of authentication required for the admission of documents and- records into ■ evidence, does not provide a mechanism of authentication whereby the attorney for the party seeking to introduce the documents may authenticate the documents by his or her declaration. Poerschke has not made any foundational averments in her declaration as to her status as the legal custodial) of the documents[5] or that the documents were business records kept in the regular course of the business. See Rule 44(a)(1) and (h).
We note that Rule 901(a), Ala. R. Evid., provides -that “[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that. the matter in question is what its proponent, claims.” Authentication may be established1 by testimony from a witness with knowledge “that a matter is what it is claimed to be.” Rule 901(b)(1), Ala. R. Evid. An attorney’s declaration does not authenticate a document unless the attorney had personal knowledge that the document is what it is claimed to be. Orr v. Bank of America, 285 F.3d 764 (9th Cir.2002).[3]. See Logan v. City of Pullman, 392 *910 F.Supp.2d 1246 (E.D.Wash.2005); Clark v. County of Tulare, 765 F.Supp.2d 1075 (E.D.Cal.2010). “ ‘A document can be authenticated [under Rule 901(b)(1)] by a witness who wrote it, signed it, used it, or saw others do so.’ ” Orr, 285 E.3d at 774 n. 8 (quoting Wright & Gold,- Federal Practice & Procedure: Evidence -.§ 7106, 43 (2000)).
Poerschke stated in her declaration that she was “competent to testify as to the truth of the matters set forth.[therein] and could and would competently testify thereto from [her] own personal knowledge” and that the copies of the exhibits attached to the declaration were “true and correct.” Poerschke has failed to assert facts evidencing personal knowledge as to the compilation and contents of these exhibits. To the extent that her statement that, “as one of the. attorneys of record, I was physically present during, the entire [FINRA] arbitration hearing” can be construed as averring personal knowledge of the exhibits, we note that the Fund contends in its brief that the materials evidencing a conflict on the part of Julavits and Kunis were not discovered until, after the arbitration proceeding had been concluded. Thus, Poerschke could not have gained any personal knowledge of the exhibits relative to the Fund’s motion to vacate during the arbitration proceeding. Although Poerschke’s declaration purports - to authenticate the documents printed from the Internet, she in fact lacks the personal knowledge required to set forth with any certainty that the documents obtained via third-party Web sites are, in fact, what she proclaims them to be. Accordingly, we conclude that the- Poerschke declaration alone was insufficient to authenticate the exhibits offered in support of the motion to-vacate. However;* some of the documents may still be properly admitted for other reasons.

2, ' The Callawassie Payers

As discussed in detail above, the Fund offered into evidehce court documents, including pleadings and orders, from five separate actions filed in 2011 in Beaufort County, South Carolina, in which Julavits was named as a third-party defendant in actions asserting against him claims substantially similar to those' asserted by the Fund against MAM and Morgan Keegan (“the Callawassie papers”). The Fund argued that the claims - asserted against Julavits in the South Carolina litigation were “strikingly” similar to the claims asserted by it against MAM and Morgan Keegan and that the South Carolina litigation should have been disclosed pursuant to the FINRA Rules.
MAM and Morgan Keegan objected to the Callawassie papers on the ground they were not properly authenticated pursuant to Rule 44(a)(1), Ala. R. Civ. P., which governs the method for authenticating an official record. As stated above, the Poerschke declaration alone was insufficient to authenticate the documents attached as exhibits to the motion to vacate.
The Fund argues on appeal that the trial court was free to take judicial notice of the pleadings filed in the South Carolina litigation and was, therefore, free to consider those pleadings in ruling on the motion to vacate. Generally, ,a court may not take judicial notice of the records of another court.. Garrett v, Hadden, 495 So.2d 616 (Ala.1986). Charles W. Gamble and Robert J. Goodwin, McElroy’s Alabama Evidence § 484.02(2) (6th ed.2010), states: ...
“The circuit court takes judicial notice .of all parts of its record of the case in hand. For a proper purpose, the circuit court takes judicial notice of its own record in another case if, but only if, the *911 pleadings in the case in hand refer to the record in the other case. . However, the circuit court cannot take judicial notice of its record in' another case for the purpose of supplying evidence in the case at hand, as the record in the other case must be introduced in evidence if it is to be considered as evidence.
“Circuit courts do not take judicial notice of the records of another court.”
However, a court may take judicial “ ‘notice of another court’s order ... for the limited purpose of recognizing the “judicial act” that the order represents or the subject matter of the litigation and related filings.’” In re Delta Res., Inc., 54 F.3d 722, 725 (11th Cir.1995) (quoting United States v. Jones, 29 F.3d 1549, 1553-54 (11th. Cir.1994)).[4] See also Liberty Mut. Ins. Co. v. Rotches Pork Packers, Inc., 969 F.2d 1384, 1388-89 (2d Cir.1992) (stating that “[a] court may take judicial notice of a document filed in another court ‘... to establish • the fact of such litigation and related filings’”). In Al Najjar v. Ashcroft, 257 F.3d 1262 (11th Cir.2001), an appeal from a deportation proceeding, the appellant argued on appeal that his detainment by- the Immigration and Naturalization Service and subsequent custody proceedings improperly affected his deportation case. The appellant requested that the court either supplement the record on appeal or take judicial notice of a number of documents, including newspaper articles describing his detainment and custody proceedings. In taking judicial notice of the custody proceedings, the court stated:
“Although we are jurisdictionally precluded from admitting the proffered newspaper articles describing the custody proceedings, we may, and do, take judicial notice of the fact that [appellant’s] custody proceeding occurred and thé subject matter thereof»- See In re Delta Resources, Inc., 54 F.3d 722, 725 (11th Cir.1995) (‘[T]his Court may take judicial “notice of another court’s order ... for the limited purpose of recognizing the ‘judicial act’,that the order represents-or the subject matter of the litigation and related filings.’ ”). We will not take judicial notice-of any factual findings, legal conclusions, or arguments advanced in the custody proceedings, and we will not consider these proceedings as impacting any of the [appellant’s] claims on ■ appeal. See ■ 8 - U.S.C. § 1105a(a)(4). In sum,- we take judicial notice of the fact that [appellant’s] custody proceedings occurred, and the subject matter thereof, although we will not rely on thése proceedings in reviewing the [Board of Immigration Appeals’] decisions.” •
257 F.3d at 1282-83.
It is not seriously disputed that Julavits was named a third-party defendant in the South Cárolina litigation. In fact, Morgan Keegan submitted the same court documents from the South Carolina litigation that were submitted by the Fund, plus additional court documents from the South Carolina litigation not submitted by the Fund, in support of its response in opposition to the Fund’s motion to vacate. The trial court stated in ife order denying the Fund’s ‘motion to vacate that “[i]t is undisputed that Julavits was named as a third-party defendant in five related cases in South Carolina.” Accordingly, we conclude that the trial court could have properly considered the Callawassie papers in order to take judicial notice of the South Carolina litigation for the limited purpose of concluding that the litigation occurred *912 and that Julavits was named as a third-party defendant in that litigation.
3. The “Hagman Order” and “Antietam Motion ” :
The Fund submitted as an exhibit to its motion to vacate the judgment entered on the 'arbitration award an order issued by the Superior Court of-Los Angeles County, California, in Hagman v. Citi-Group Global Markets, Inc. (Super.Ct. no. BS128800) (Feb. 9, 2011) (“the Hagman order”), in which that court vacated an arbitration award based on California law as a result of the arbitrator’s failure to disclose his involvement two years earlier in his own lawsuit involving the same subject matter made the basis of the arbitration. In its reply in support of. the motion to vacate the judgment, entered on the arbitration award, the Fund submitted a pleading filed by Morgan Keegan in an action styled Antietam Industries, Inc. v. Morgan Keegan & Company, Case no. 6:12-CV-1250 (M.D.Fla., August 13, 2012) (“the Antietam motion”), in which Morgan Keegan moved the court to vacate an arbitration judgment, arguing that the arbitrator had failed to disclose his involvement in prior litigation involving the same subject matter of the arbitration. The Fund argues that the trial court was free to take judicial notice of these exhibits.
Both the Hagman order and the Antietam motion were offered for more than just recognizing a judicial act or the subject matter of the litigation. In re Delta Res., Inc., 54 F.3d at 725. The Hagman order was offered to show a legal conclusion reached by another court. The Antietam motion was offered to show an argument and position taken by Morgan Keegan in another case. Because these two documents were offered for more than the limited purpose of recognizing a judicial act or the subject matter of the litigation, the trial court could not have properly taken judicial notice of these documents and considered them in reaching its determination in this matter. Al Najjar, 257 F.3d at 1283 (noting that a court “will not take judicial notice of any factual findings, legal conclusions, or arguments advanced in the [other] proceedings”)..

Jp. Maxim Group and Morgan Keegan as Codefendants

The Fund submitted as an exhibit to the Poerschke declaration the class-action complaint filed in Fire & Police Pension Association of Colorado v. American International Group, Inc., Case no. 08-CV-10586 (S.D.N.Y. December 4, 2008), in which Maxim Group and Morgan Keegan were named codefendants, along with numerous, other defendants, in an action brought by a pension fund seeking to recover losses on securities underwritten by Maxim Group and Morgan Keegan. The Fund also submitted a docket sheet from an action styled In re the Mills Corp. Securities Litigation, Case no. 1:06-CV-00077 (E.D.Va. January 20, 2006), in which both Maxim Group and Morgan Keegan were named, among numerous others, as codefendants and were represented by the same attorney. Although both Maxim Group and Morgan Keegan were represented by the same attorney, that attorney was hot an employee of Greenberg Trau-rig. Again, the Fund argues that the trial court was free to take judicial notice of these exhibits. As with the Callawassie papers, the trial court could have properly considered the class-action complaint and th'e docket sheet for the limited purpose of taking judicial notice of the fact that Maxim Group and Morgan Keegan ■ were named as codéfendants in litigation involving securities. In re Delta Resources, supra.
5. Exhibit M — Securities Issuances
In support of its argument that Kunis’s firm — Maxim Group — and Morgan Keegan *913 had a close, ongoing relationship, the Fund submitted documents indicating that Maxim Group and Morgan Keegan had participated together as co-underwriters on 36 issuances of multi-million-dollar securities. Those documents were attached as Exhibit M to the Poersehke declaration. Initially, we note that MAM and Morgan Keegan do not dispute that Morgan Keegan and Maxim Group participated together, among others, as underwriters in the above-mentioned 36 securities issuances. Further, as mentioned above, MAM, and Morgan Kee-gan do not dispute the contents of Exhibit M. In fact, in its response in opposition to the motion to vacate the judgment entered on the arbitration -award, Morgan Keegan submitted the affidavit of its expert in which the expert based his opinion, in part, on Exhibit M. Morgan Keegan also presented in support of its response in opposition to the motion to vacate an annotated version of Exhibit M upon which -its expert’s opinion was based.
Because Morgan Keegan relied on Exhibit M in its response in opposition to the motion to -vacate and has not challenged the contents of Exhibit M, we cannot say that the trial court exceeded its considerable discretion by denying MAM and Morgan Keegan’s motion to - strike Exhibit M and in. subsequently relying on the contents of Exhibit M. Bowers v. Wal-Mart Stores, Inc., 827 So.2d 63 (Ala.2001).- Consequently, this Court may consider Exhibit M on appeal.'

6. Additional Web Site Materials

The Fund presented additional materials printed from various Web sites, which, it says,:-also evidence a close, ongoing relationship between Maxim Group and Morgan Keegan. The materials are attached to the Poersehke declaration as Exhibits Q1-Q8, R, T, U, V, W, X, AA, DD, and EE.- Exhibits Q1-Q8 evidence securities issuances in which-. Greenberg Traurig, Morgan Keegan’s counsel, represented Maxim Group. The remaining exhibits . evidence Maxim Group’s involvement in the underwriting, management, and distribution of securities similar to those at issue in the underlying arbitration and the fact that some of the securities underwritten, managed, and distributed by Maxim Group were actually owned by the Fund. Again, MAM and Morgan Keegan have not challenged or disputed- the contents of those exhibits and do not dispute that Greenberg Traurig represented Maxim Group in the security issuances or that Maxim Group was involved in the underwriting, management, and distribution of securities similar to those made the basis of the arbitration proceeding.
These materials consist of various offering prospectuses, shareholder reports, and offering circulars.' These exhibits were not relied on by MAM or Morgan Keegan in their response in opposition to the motion to vacate as was Exhibit M. However, the Fund, relying upon Perfect 10, Inc. v. Cybernet Ventures, Inc., 213 F.Supp.2d 1146 (C.D.Cal.2002), argues that the Poersehke declaration establishes the authenticity of the documents printed from Web sites when the declaration is viewed in combination with circumstantial indicia of authenticity, such as the.dates the documents were printed and the Web addresses from which the documents were printed. As discussed above, the Poersehke declaration is insufficient as an authenticating source because.it lacks the requisite personal knowledge.. Further, the exhibits do not contain the Web addresses of the Web sites from which they were printed, nor do they indicate the dates on which they were printed.
However, concerning authentication we note that the exhibits do contain other “distinctive characteristics” that, when considered in light of the -circumstances, support a-finding that the exhibits *914 are what the Fund claims- they are. -See Rule 901(b)(4), Ala. R. Evid., providing as “examples of authentication or identification conforming with the requirement of this rule” “Distinctive Characteristics and the Like. Appearance, contents, substance, internal patterns, or other distinctive characteristics, taken in conjunction with circumstances.” (Emphasis added.) “The evidence establishing authenticity, however, ‘does not have to be conclusive or overwhelming; rather,, it must be strong enough for the question to go to the jury/ ” Royal Ins. Co. of America v. Crowne Invs., Inc., 903 So.2d 802, 809 (Ala.2004) (quoting the Advisory Committee’s Notes, Rule. 901(a), Ala. R. Evid.).
. The “contents” of these exhibits primarily. consist of shareholder prospectuses and offeiing circulars that contain highly technical and detailed financial analysis based on current market information and recommendations to potential investors based on that analysis. One exhibit consists of an in-depth shareholder financial report thát had been filed with the United States Securities and Exchange Commission. Because of the highly technical nature of the financial documents, we cannot say' that the trial court exceeded its wide discretion in denying the motion to strike as to these documents. This conclusion is only bolstered when considered in light of the circumstance, as Rule 901(b)(4) permits, that MAM and Morgan Keegan have not challenged the contents of the documents. See Rule 901(b)(4)(noting that authentication as a condition precedent' is satisfied when contents and substance of documents taken in conjunction with circumstances support a finding that the matter in question is what its proponent claims it * is).

7. The Hearsay Objections

The Fund also sought to admit as exhibits to the • Poerschke declaration, a FINRA publication entitled -“The Neutral Corner” and a- marketing piece published by Greenberg Traurig (“the Greenberg booklet”) touting the firm’s and its lawyers’ accomplishments, areas of practice, experience, and clients. The Neutral Corner contained information indicating that a prospective arbitrator should disclose the fact that he or she had been sued for breach of a fiduciary duty if he or she has been selected to serve in an arbitration proceeding in which a breach of fiduciary duty has been alleged. The Greenberg booklet indicated that Greenberg Traurig, the law' firm that ■ represented Morgan Keegan in the underlying1 arbitration proceeding, had represented Maxim Group in a $60 million initial public offering, or IPO. MAM and Morgan Keegan objected to these exhibits on grounds of hearsay. “Hearsay”- is defined by Rule -801(c), Ala. R. Evid., as. “a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted.” A hearsay statement may be either oral or written. .Rule 801(a), Ala. R. Evid.
Here, the .Fund offered The Neutral Corner to establish that a prospective arbitrator should*disclose litigation in which he or she-was a party that involved the same allegations as those asserted in the arbitration proceeding. The Fund offered-the Greenberg - booklet to demonstrate that Maxim Group had an ongoing attorney-client relationship with Greenberg Traurig. As such, both- documents constituted inadmissible hearsay and cannot be considered by this. Court on appeal.

8. Summary, of Thisfiourt’s Holdings

In sum, the- Court has determined that the Poerschke declaration is an insufficient authenticating source for the attached exhibits; that the- trial- court could have properly taken -judicial notice of the Calla-wassie papers but could not' have takeh judicial notice of the Hagtoan order or the Antietam motion; that the -trial court could have taken judicial notice of the class- *915 action complaint and the docket sheet evidencing that Morgan Keegan and Maxim Group had. been named as codefendants in securities litigation; that Exhibits M, Ql-Q8, R, T, U, y, W, X, AA, DD, and EE were admissible; and that The Neutral Corner and the Greenberg booklet were inadmissible.
We now address the issue whether Ju-lavits’s and Kunis’s failure to disclose certain facts as argued by the Fund created a reasonable impression of bias constituting an evident partiality on the part of the arbitrators..

B. Arbitrators’ Failure to Disclose

The Fund argues on appeal that the judgment entered on the arbitration award is due to be vacated because Julav-its and Kunis did not provide full disclosure as was required by the FINRA Rules. As stated above, the trial court found that both Julavits and Kunis' failed to make disclosures required by the FINRA Rules and that the failure to make those disclosures was “contrary to the spirit of all of the FINRA Rules and guidelines.” After carefully reviewing the admissible evidence in this case, this Court agrees with the trial court’s finding that arbitrator disclosure is the “cornerstone” ■ of FINRA arbitration and that the arbitrator has a continuous and imperative duty to disclose any relationships, experiences, and background information “that may affect — or even appear to affect — 'the arbitrator’s ability to be impartial.” We further agree with the trial court’s conclusion that Julav-its and Kunis both failed to disclose certain information, as discussed in detail above, and that the- failure to disclose this information was contrary to the FINRA Rules relating to arbitrator disclosure.

C. Vacatur of Judgment Entered on Arbitration Award

The Fund argues that it is entitled to have the judgment entered on the arbitration award vacated pursuant to the grounds provided in 9 U.S.C. § 10(a)(1) through (4), which provide that an arbitration award may be vacated:
“(1) where the award was procured by ! corruption, fraud, or undue means;
“(2) where there was evident partiality or corruption in the arbitrators, or ei: ther of them;
“(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy;, or of any other misbehavior by which the rights of any party have been prejudiced; or
“(4). where the arbitrators exceeded . their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.”
Because we find dispositive thé arguments as they relate to “evident partiality,” 9 U.S.C: §10(á)(2), we will address those arguments first.' The Fund argues that the judgmeht entered on the arbitration award is due 'to be vacated because the failure by Julavits and Kunis to make the disclosures discussed above created a reasonable impression of bias constituting an “evident partiality” on the part of the arbitrators under 9 U.S.C. § 10(a)(2). After thoroughly surveying caselaw from various federal courts, this Court, in Waverlee Homes, Inc. v. McMichael, 855 So.2d 493 (Ala.2003), adopted the “reasonable impression of partiality” as the standard for determining whether evident partiality exists under 9 U.S.C. § 10(a)(2).. Specifically, this Court stated:
‘We conclude that the weight of authority developed after Commonwealth Coatings [Corp. v. Continental Casualty Co., 393 U.S. 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968),] requires a review of *916 the offered .evidence pursuant to the ‘reasonable impression of' partiality’ standard, using the criteria developed in the federal cases reviewed above. The appropriate approach for the trial court to take in assessing [a motion to vacate a judgment entered on an arbitration award based on allegations of ‘evident partiality’] is to consider whether [the movant] makes a showing through admissible evidence that the court finds to be credible, that gives rise to an impression of bias that is direct, definite, and capable of demonstration, as distinct from a ‘mere appearance’ of bias that is remote, uncertain, and speculative.”
Waverlee Homes, 855 So.2d at 508. Justice Murdock, writing for the Court in Lexington Insurance Co. v. Southern Energy Homes, Inc., 101 So.3d 1190 (Ala.2012), aptly explained this Court’s adoption in Waverlee Homes of the “reasonable-impression-of-partiality” standard and what has become known as “nondisclosure” cases versus “actual-bias” cases:
“In Waverlee Homes, this Court surveyed federal cases brought after the arbitrator had been named, and after the arbitrator had made an actual award. 855 So.2d at 503-08. In most, if not all, of these federal cases, the issue was whether the arbitrator had failed to make a pre-selection disclosure of facts that might have demonstrated bias or a conflict of interest on his part and whether this nondisclosure itself demonstrated an ‘evident partiality’ on the part of the arbitrator under 9 U.S.C. § 10(a)(2) so as to justify the vacatur of the resulting arbitration award. The opinion in one of these cases, Schmitz v. Zilveti [20 F.3d 1043 (9th Cir.1994)], provides a helpful explanation of the distinction between what have become known as ‘nondisclosure’ cases and ‘actual bias’ cases:
' •“ ‘Appellants argue that Commonwealth Coatings Corp. v. Continental Cas. Co., 393 U.S, 145, 89 S.Ct. 337, 21 L.Ed.2d 301 (1968), requires, us to reverse the district court. In,Commonwealth Coatings, one arbitrator on a panel of three failed to disclose that he had engaged in periodic and significant business relations with one of the parties to the arbitration over the previous five or six years. Id. at 146, 89 S.Ct. at 338 — The party that lost the arbitration then. challenged the award, asserting that the failure of this arbitrator to disclose his significant business relationship resulted in “evident partiality” under 9 U.S.C. § 10[ (a)(2)], warranting vacatur of the award.
“ ‘The district court held' that “the arbitrator ... was entirely fair and impartial,” id. at 151 n. * , 89 S.Ct. at 340 n. *, and refused to vacate the award. Without disturbing the finding that the arbitrator was not biased, ‘id. at 147-50 & 151 n. *, 89 S.Ct. at 338-40 & 340 n. *, the Supreme Court reversed and vacated the award. The Court held that an arbitrator’s nondisclosure of facts shewing a potential conflict of interest creates evident partiality warranting vacatur even when no actual bias. is present. The Court tried to articulate a standard indicating what facts show evident partiality when not disclosed by an arbitrator, The Court described facts that must be disclosed as those that “might create an impression of possible bias,” id. at 149, 89 S.Ct. at 339, •those that show the “appearance of bias,” id. at 150, 89 S.Ct. at 340, and those that, indicate that arbitrators “might reasonably be thought biased against one litigant and favorable to another,” id.’
“20 F.3d at 1045 (emphasis added).
“After noting that two of its previous decisions had ‘involved allegations of ac *917 tual bias rather than a failure to disclose,’ 20 F.3d at 1046, the Schmitz court additionally explained:
“ ‘How to apply Commonwealth Coatings in a nondisclosure case. is an issue of first impression in the Ninth Circuit. Other courts facing the same issue have held that “evident partiality” is present when undisclosed facts show “a reasonable impression of partiality.” [Middlesex Mut. Ins. Co. v.] Levine, 675 F.2d [1197] at 1201 [ (11th Cir.1982) ]; see Sanko S.S. Co. v. Cook Indus., Inc., 495 F.2d 1260, 1263-64 (2d Cir.1973).... Consistent with Commonwealth Coatings, cornis examining nondisclosure cases have not required proof of actual bias in showing “evident partiality.” See Levine, 675 F.2d at 1200-02; Sanko S.S. Co., 495 F.2d at 1263-64.

It (

“‘Though Toyota of Berkeley [v. Automobile Salesman’s Union, Local 1095, 834 F.2d 751 (9th Cir.1987),] and [Sheet Metal Workers International Ass’n v.] Kinney Air [, 756 F.2d 742 (9th. Cir.1985),] provide some .support for the proposition that Commonwealth Coatings establishes “reasonable impression of partiality” as a legal standard, both the facts and factual analyses of those cases are inap-posite to the instant nondisclosure case. Both involve allegations of actual bias rather than evident partiality from failure to disclose. Toyota of Berkeley, 834 F.2d at 756-57; Kinney Air, 756 F.2d at 746. Moreover, both opinions distinguish their facts from those of nondisclosure cases, including Commonwealth Coatings. Toyota of Berkeley, 834 F.2d at 756; Kinney Air, 756 F.2d at 746.
“‘Notwithstanding the factual dissimilarity of Toyota of Berkeley and Kinney Air with nondisclosure cases, both Toyota of Berkeley and Kinney Air employ the “reasonable impression of partiality” standard taken from Commonwealth Coatings, a nondisclosure case. Toyota of Berkeley, 834 F.2d at 756-57; Kinney Air, 756 F.2d at 746; see also Employers Ins. [of Wausau v. National Union Fire Ins. Co. of Pittsburgh], 933 F.2d [1481,] at 1481 [ (9th Cir.1991) ]; [Sheet Metal Workers Int’l Ass’n, Local No. 162 v.] Jason Mfg.[, Inc.], 900 F.2d [1392] at 1392 [ (9th Cir.1990) ]. That these actual bias cases apply the Commonwealth Coatings standard to allegations of actual bias is confusing. In an actual bias case, a court must find actual bias. Finding a “reasonable impression" of partiality is not equivalent to, nor does it imply, a finding of actual bias. Otherwise, the Commonwealth Coatings court could not have held that a reasonable impression of partiality was present when no actual bias-was shown.
“ ‘The policies of 9 U.S.C. § 10 also support the notion that the■ standard for i nondisclosure cases should differ from that used in actual bias cases. In a nondisclosure case, the integrity of the process by which the arbitrators are chosen is at issue. Showing a “reasonable impression qf partiality” is sufficient in a nondisclosure case because the policy of section 10(a)(2) instructs that the parties should choose, their arbitrators intelligently. Commonwealth Coatings, 393 U.S. at 151, 89 S.Ct. at 340 (White, J., concurring). The parties can choose their arbitrators intelligently only when facts showing potential partiality are disclosed. Whether the arbitrators’ decision itself is faulty is not necessarily relevant. But jn an actual bias ■determination, the integrity of the arbitrators’ decision is directly at issue. *918 That a reasonable impression of partiality is present does not mean the arbitration award was the product of impropriety.’
“20 F.3d at 1046-47 (emphasis added).
“It is not clear whether Waverlee Homes, itself, was a ‘nondisclosure’ case or an ‘actual bias’ case. Although the facts as described in the opinion suggest an ‘actual bias’ case, the Court concluded its opinion with an endorsement of the ‘reasonable impression’ standard articulated in the federal ‘nondisclosure’ cases it had surveyed.”
Lexington Ins., 101 So.3d at 1205-07. Thus, we apply the “reasonable-impression-of-partiality” standard enunciated in Waverlee to the facts of this “nondisclosure” case.
The Fund presented evidence indicating a business relationship between -Kunis’s financial firm, Maxim Group;1 Morgan Keegan; and Greenberg Traurig.. The Fund alleged: (1) that Maxim Group had been a co-underwriter with Morgan Kee-gan on at least 36 multi-million-dollar equity and debt issuances, (2) that Maxim Group and Morgan Keegan had been code-fendants in lawsuits, including lawsuits filed by investors to recover losses insecurities underwritten by Maxim Group and Morgan Keegan; (3) that Maxim Group had an attorney-client relationship with Greenberg Traurig, the law firm representing Morgan Keegan, in the arbitration proceeding, and Greenberg Traurig, had represented Maxim Group in a number of underwritings; and (4) that Kurds failed to disclose Maxim Group’s involvement with the investment products at issue in this case.
The Fund argues that Kunis’s failure to disclose the significant business relationship between Maxim Group, Morgan Kee-gan, and Greenberg Traurig created a reasonable impression of partiality constituting an evident -partiality on' Kunis’s part. MAM .’and Morgan Keegan argue that the Fund has failed to establish that Kunis was even aware of the facts-relating to the existence of a business relationship and that Kunis’s lack of knowledge relative to the existence of a business relationship precludes an finding of a reasonable impression Of partiality constituting a finding of evident partiality. The Fund counters with the argument that, where an arbitrator has a duty to investigate possible conflicts, the law will impose constructive knowledge of any undiscovered conflict upon the arbitrator where the arbitrator does nothing to fulfill his'or her duty to inform himself or herself of possible conflicts.
MAM and Morgan Keegan rely on Gianelli Money Purchase. Plan & Trust v. ADM Investor Services, Inc., 146 F.3d 1309 (11th. Cir.1998), in support of their position that actual knowledge of a potential conflict is necessary to establish a “reasonable* impression of' impartiality” constituting a finding of “evident partiality.” In Gianelli, ADM Investor Services, Inc., a futures-commission merchant, and Basic Commodities, Inc., entered into an agreement under which ADM executed commodities trades for customers brought in by Basic. One of the clients Basic brought to ADM was Gianelli Money Purchase Plan and Trust. The Gianelli Trust lost' approximately $100,000 in less than a year in the fixtures markets. Gianelli Trust claimed that Basic’s president, Kent C. Kelley, caused those losses through mismanagement of its account. ' In an attempt to recoup its losses, Gianelli Trust filed a claim against ADM with the American Arbitration Association (“AAA”). It sought to hold ADM liable on an agency theory, asserting that tt was liable for Kelley’s wrongdoings and mismanagement.
The parties jointly selected Keith Houck as the sole arbitrator, Houck had served as office manager for the law firm of Gray, Harris & Robinson (“Gray Harris”) since *919 1990. Before the arbitration proceeding, Gianelli Trust learned that Gray Harris had represented Kelley in a 1992 securities case. When Gianelli Trust asked about this, Houck asserted that he was unaware of the case, while Kelley falsely asserted that Gray Harris’s- representation of him was an isolated incident. Additionally, Houck signed an arbitrator’s oath that stated that he had nothing to disclose. After receiving those assurances, Gianelli Trust accepted Houck as the sole arbitrator. Houck conducted the arbitration hearings and ultimately entered an award in favor of ADM, finding it not liable to Gianelli Trust. Gianelli, supra.
Gianelli Trust subsequently discovered that Kelley had had frequent contact with Gray Harris. Specifically, Gray Harris helped Kelley form, three companies and represented two others in which Kelley was involved in 1976; the firm also represented Kelley as an individual from 1977 to 1986. Gianelli Trust moved to vacate the arbitration award, contending that Houck, as an employee of Gray . Harris, had displayed partiality to ADM. The district court granted the motion and vacated the arbitration award. Gianelli, supra.
In reversing the district court’s judgment, the United States Court of Appeals for the Eleventh Circuit stated;
“In vacating the arbitration award in this case, the district court relied heavily on Schmitz v. Zilveti 20 F.3d 1043 (9th Cir.1994).[5] In that case, .the Ninth Circuit found evident partiality where an arbitrator, who was also an attorney, did not investigate potential conflicts or disclose that his firm had performed legal work for one of the parties’ corporate parents. See id. at 1048. Schmitz held that the arbitrator’s failure to investigate could , create a reasonable perception of partiality. See id. at 1048-49.
“The district court found Schmitz to be closely analogous to this case. In particular, the court noted that, as in Schmitz, the arbitrator (Houck) was employed by a law firm (Gray Harris) that had a long-standing relationship with someone closely connected to one of the arbitrating parties (Kelley). Furthermore, the district court reasoned that had Houck investigated possible conflicts of interest as Schmitz requires, he would have discovered the previous work that Gray Harris had performed for Kelley, and disclosure of that relationship, would have afforded Gianelli a more informed basis upon which to decide whether to proceed with Houck as arbitrator.. Therefore, the district court, following Schmitz, concluded that it should vacate the arbitration award.
“The problem with the district court’s analysis is that- Schmitz conflicts with the law 'of this Circuit. In Lifecare Int’l, Inc. v. CD Medical, Inc., 68 F.3d 429 (11th Cir.1995), the arbitrator accused of ‘evident partiality’ became ‘of counsel’ to a law firm that had two' contacts with CD Medical, including one ‘for the purpose of obtaining representation in the instant dispute.’ Id. at 434. This Court noted that even’ the most routine background check by, the arbitrator would have brought this' information to light. However, we also pointed out’ that there was no evidence that the arbitrator was actually aware of these past contacts. Because there was no evidence that the arbitrator had actual knowledge of the past contacts, we confirmed the arbitration award and rejected the proposition *920 that the arbitrator had a duty to investigate the past contacts to avoid evident partiality. In the present case it was error for the district court to rely on Schmitz, because its holding that an arbitrator’s failure to investigate past contacts with one of the parties may constitute ‘evident partiality’ is squarely at odds with the position we took in Life-care.
“Instead of following Schmitz, the district court should have applied the law of our Circuit, which is that' an arbitration award may be vacated due to the ‘evident partiality’ of an arbitrator only when either (1) 'an actual conflict exists, or (2) the arbitrator knows of, but fails to disclose, information which would lead a reasonable person to believe that a potential conflict exists. See Lifecare, 68 F.3d at 433; [Middlesex Mut. Ins. Co. v.] Levine, 675 F.2d [1197] at 1202 [ (11th Cir.1982) ] (party challenging arbitration award must establish reasonable impression of partiality that is ‘direct, definite and capable of demonstration rather than remote, uncertain and speculative.’) (internal quotes omitted). Whether these conditions have been met ordinarily requires a fact-intensive inquiry. See Lifecare, 68 F.3d at 435.
“Performance of that inquiry here leads us to conclude that neither of the conditions for ‘evident partiality’ exists in this case. The district court made a factual finding, supported by the evidence in the record, that Houck was not actually biased against Gianelli. Therefore, the first condition under which an award may be vacated for evident partiality, the existence of an actual conflict, was not present in this case.

ii

“It is not entirely clear from the district court opinion whether it implicitly found that Houck was aware of-any relationship Kelley had with Gray Harris other than the [prior securities case]. However, if the district court did make such an implicit finding, that finding is clearly erroneous. All of Kelley’s contacts with Gray Harris, with the exception of the [securities] case, pre-date Houck’s employment at the firm. There is nothing in the record to indicate that Houck knew of any connection between Kelley and Gray Harris prior to 1990, when Houck joined the firm. Although given abundant opportunity to do so, Gianelli, who has the burden of persuasion, has not pointed to any evidence suggesting that Houck was aware of any relationship between Kelley and Gray Harris other than the [securities] case. As a result, the only conclusion that the record will support is that Houck was unaware of any other relationship. Because Houck did not have actual knowledge of the information upon which the alleged ‘conflict’ was founded, the second ‘evident partiality’ condition is not present in this case.”
Gianelli, 146 F.3d at 1312-13 (footnotes omitted). See also University Commons-Urbana, Ltd. v. Universal Constructors Inc., 304 F.3d 1331 (11th Cir.2002). It appears that the Eleventh Circuit is the only court of appeals that has “adopted a per se rule that a finding of evident partiality is precluded by an arbitrator’s lack of ‘actual knowledge of the information upon which [an] alleged “conflict” was founded.’” New Regency Prods., Inc. v. Nippon Herald Films, Inc., 501 F.3d 1101, 1109 (9th Cir.2007) (quoting Gianelli, 146 F.3d at 1313).
In Schmitz v. Zilveti, 20 F.3d 1043 (9th Cir.1994), a case surveyed by this Court and relied on in part in Waverlee Homes, an NASD[6] arbitrator failed to disclose in *921 his arbitrator-disclosure forms that his law firm had represented the parent company of the prevailing party in the arbitration on at least 19 occasions during a 35-year period, with the most recent representation occurring approximately 21 months before the arbitration. The record revealed that the arbitrator had run a “conflict check” for the subsidiary company only, rather than for both the subsidiary company and the parent, company, even though the arbitrator had reviewed documents that indicated that the entity participating in the arbitration was a subsidiary of the parent company. The NASD rules in effect at the time. Schmitz was decided are identical to the FINRÁ Rules applicable in this case. The NASD rules were summarized by the appellate court as follows:
“[A]n arbitrator must disclose (1) ‘[a]ny direct or indirect financial or personal interest in the outcome’; (2) ‘any .., financial, business, professional, family, or social relationships that are likely to affect impartiality or might reasonably create an appearance of partiality or bias’; and (3) any personal relationships with any party, its counsel, or witnesses. [NASD Code § 23(a)]. These relationships must be disclosed whether maintained, presently or previously, by the arbitrators or ‘members of their families or their current employers, partners, or business associates.’ Id. The NASD Code also requires arbitrators to make an investigation regarding potential conflicts of interest. NASD Code section 23(b) provides: ‘Persons who are requested to accept appointment as arbitrators should make a reasonable effort to inform themselves of .any interests or relationships described in Paragraph (a) above.’ ”
Schmitz, 20 F.3d at 1044.
The losing party to the arbitration sought to have the arbitration vacated pursuant to 9 U.S:C. § 10(a)(2), arguing that the arbitrator ■ :was “evidently partial.” The federal district court held that a party seeking to vacate an arbitration award based on “evident partiality” must prove facts establishing a reasonable impression of evident partiality and that arbitrators are required to disclose only those facts of which they are aware at the time of the hearing. The court then found that because the arbitrator was unaware of his law firm’s conflict at the time of the arbitration hearing the movants had failed to meet their burden of proof. Thus, the district court held that no “evident partiality” was present. Sphmitz, supra.
In reversing the judgment of the district court and determining that the arbitration award was due to be vacated, the United States Court of Appeals for the Ninth Circuit concluded that the arbitrator was “evidently partial” as a result of his failure to disclose his law firm’s prior representations of the prevailing party’s parent company. In reaching this conclusion, the court stated that “‘evident partiality’ is present when undisclosed facts show a ‘reasonable impression of partiality’ ” and that “nondisclosure cases [do not] require[ ] proof of actual bias in showing ‘evident partiality.’” Schmitz, 20 F.3d at 1046.
Additionally, the Schmitz court went further and addressed the. issue of the arbitrator’s lack of actual knowledge of the underlying undisclosed facts and concluded that a “reasonable impression of partiality” may exist even though an arbitrator lacks actual knowledge, of. underlying undisclosed facts, if the arbitrator, has constructive knowledge of those facts. Schmitz, 20 F.3d at, 1049. Specifically, the court stated:
“Appellants claim- that [the arbitrator] should have disclosed his law firm’s former legal representation of [the parent company], the owner -of [subsidiary]. *922 Appellants argue also that if [the arbitrator] did not know that [the parent company] was a client of his firm, he should have investigated. .
“The district court rejected both contentions, holding that [the arbitrator] was not aware of the conflict and had no duty to investigate. Some courts have considered an arbitrator’s lack of knowledge as a factor in determining whether evident partiality was present. See, e.g., [Middlesex Mut. Ins. Co. v.] Levine, 675 F.2d [1197] at 1201-02 [ (11th Cir.1982) ]; Overseas Private Inv. Corp. v. Anaconda Co., 418 F.Supp. 107, 109-12 (D.D.C.1976). The district court in this case made this factor decisive. The district court’s conclusion appears to be premised on the idea that no person could reasonably conclude that an arbitrator could act partially based on facts of which he was unaware. Anaconda, 418 F.Supp. at 112. This premise is Appellees’ only argument on appeal regarding the evident partiality of [the arbitrator].
“Appellants have a better argument. Though lack of knowledge may prohibit actual bias, it does not always prohibit a reasonable impression of partiality. As Appellants argue, an arbitrator may have a duty to investigate independent of its Commonwealth Coatings duty to disclose. A violation of this independent duty to investigate may result in a failure to disclose that creates a reasonáble impression of partiality under Commonwealth Coatings. For instance, the parties can expect á lawyer/arbitrator to investigate and disclose conflicts he has with actual parties to the arbitration. Close v. Motorists Mut. Ins. Co., 21 Ohio App.3d 228, 486 N.E.2d 1275 (1985) (holding that the failure to do so created a reasonable impression of partiality under Commonwealth Coatings). The NASD Code required [the arbitrator], a lawyer, - to make such an investigation regarding the actual parties to this arbitration. In the typical lawyer/arbitrar tor’s case, lack of knowledge of a conflict may preclude a finding of actual bias. -However, a reasonable impression of partiality can form when an actual conflict of interest exists and the lawyer has constructive knowledge of it. 486 N.E.2d at 1278-79. That the lawyer forgot to run a conflict check or had forgotten that he had previously represented the party is' not an excuse. See In re Siegal, 153 N.Y.S.2d 673 (Sup.Ct. 1956); Also, an arbitrator may not know facts of which he may have been suspicious or of Which he was on notice which, if true, would create a reasonable impression of partiality if not investigated and disclosed.
“Requiring arbitrators to make investigations m certain circumstances gives arbitrators an incentive to be forthright with the parties, honestly disclosing what arbitrators might otherwise have an incentive to hide. Commonwealth Coatings establishes that the parties rather than the arbitrators or the courts should be the judges of the partiality of arbitrators:
“ ‘In many cases the arbitrator might believe the business relationship to be so insubstantial that to make a point of revealing it would suggest he is indeed easily swayed, and perhaps a partisan of that party. But if the law requires the disclosure, no such imputation can arise. And it is far better that the relationship be disclosed at the outset, when the parties are free to reject the arbitrator or' accept him with knowledge of the relationship and continuing faith in his objectivity, than to have the relationship come to light after the arbitration, when a suspicious or- disgruntled party can seize on it as a pretext for invalidating the award. The judiciary should minimize *923 its role in arbitration as judge of the arbitrator’s impartiality. That role is best consigned to. the parties, who are the architects of their own arbitration process, and are far better informed of the prevailing ethical standards and reputations within their business.’ •
“393 U.S. at 151, 89 S.Ct. at 340 (White, J., concurring) (footnote omitted). If the parties are to be judges of the arbitrators’ partiality, duties to investigate and disclose conflicts must be enforced, even if later a court finds that no actual bias was 'present. See Close, 480 N.E.2d at 1278-79. We therefore decline to adopt a per se rule that no reasonable impression of-partiality can be found absent a showing that the arbitrator knew the facts on which it is based.
“In this case, [the arbitrator] had a duty to investigate the conflict at issue. Section 23(a) & (b) of the NASD Code requires arbitrators to ‘make a reasonable effort to inform themselves of any’ ‘existing or past financial, business, [or] professional ... relationships [that they or their employer, partners, or business associates may have] that are likely to affect impartiality or might reasonably create an appearance of partiality or bias.’ ...
“[The arbitrator] ... had a duty under the NASD Code to make a reasonable effort to inform himself of his firm’s representation of [the parent company], [The arbitrator], did nothing to fulfill that duty. Thus, though he lacked actual knowledge, he had constructive knowledge of his -firm’s previous representation of [the parent company]. Given [the arbitrator’s] constructive knowledge and the presence of the cpnflict, [the arbitrator’s] failure to inform the parties, to the arbitration resulted in a reasonable impression of partiality under . Commonwealth Coatings. See Close, 486 N.E.2d at 1278-79.”
Schmitz, 20 F.3d at 1048-49.
The Schmitz decision espouses the majority view in the federal.courts .in.determining whether an “evident partiality” exists under 9 U.S.C. § 10(a)(2) in the context of a failure-to-investigate/failure-to-disclose case. See generally New Regency Productions, supra. We believe the holding in Schmitz is the better view and conclude that the “reasonable-impression-of-partiality” standard constituting an. “evident partiality” under 9 U.S.C. § 10(a)(2) niay be satisfied even though an arbitrator lacks actual knowledge of the facts giving rise to the conflict of interest when the arbitrator was under a duty to investigate in order to discover possible conflicts and failed to do só. In such a situation the arbitrator will be deemed to have constructive knowledge of the conflict of interest, and the- failure to disclose the conflict may result in a “reasonable impression of partiality.” Schmitz, 20 F.3d at 1048-49.
The arbitration proceeding in this case was governed by the FINRA Rules as agreed upon by the parties in them contracts. Those agreed-upon rules deal with arbitration in a highly specialized field of law and finance and impose upon an arbitrator, both prospective and sitting, a stringent and ongoing duty to disclose potential conflicts. The FINRA.arbitrator-disclosure requirements “strongly encourage[J arbitrators to make a wide variety of disclosures [and] ... when in doubt, always err in favor of making a disclosure,” because meeting the disclosure requirement is part of an “arbitrator’s overarching duty,” Thus, it is within the context of the FINRA Rules that we must determine whether the Fund, has demonstrated an evident partiality on the part of Kunis pursuant to 9 U.S.C. § 10(a)(2). We note that-the FINRA Rules imposed upon Kun- *924 is the duty to “make a reasonable effort to learn of and ... disclose ... any circumstances which might, preclude the arbitrator from rendering an objective and impartial determination in the proceeding, including” (1) “[a]ny existing or past financial, business, proféssional, family, social, or other relationships or circumstances with any party ... that áre likely to affect impartiality or'might reasonably create an appearance of partiality or bias”; and (2) ■“[a]ny such’ relationship or circumstances involving’... the arbitrator’s current employers, partners, or business associates'.” The trial court found in its order that “had a basic conflict check been conducted by Kunis, the relationships between [Maxim Group and Morgan Keegan], and possibly between [Maxim' Group] and Greenberg Traurig, would have been revealed.” In-. deed, since 2002, Kunis had been a Vice president and partner in Maxim Group, a relatively, small investment firm. As an officer and partner in the firm, Kunis would have had a substantial interest in the firm’s business dealings, including any litigation in which it was involved. Finally, we note that the evidence indicates that the business relationship present here between Maxim Group and Morgan Keegan was not fleeting and that the two firms “did more than trivial business” with each other. See Olson v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 51 F.3d 157, 159 (8th Cir.1995). Thus, we conclude, as did the trial court, that a cursory conflict check by Kunis would have revealed the business • relationships between Maxim Group, Morgan Keegan, and Greenberg Traurig.
The FINRA Rules imposed upon Kunis the duty to make á reasonable effort to discover the business relationship between Maxim ' Group, Morgan Keegan, and Greenberg Traurig, and he did nothing to satisfy this duty. Although Kunis may have lacked actual knowledge of the business relationship between Maxim Group, Morgan‘Keegan, and Greenberg Traurig, he had constructive knowledge of the business relationship between those parties. Schmitz, 20 F.3d at 1048-49; Because Kun-is had constructive knowledge of the business- relationship - between Maxim Group, Morgan Keegan, and Greenberg Traurig, and because of the presence of the conflict itself, Kunis’s failure to disclose this relationship resulted in a reasonable impression of partiality. Waverlee Homes, supra, Schmitz, supra. Additionally, given the nature and extent of the business relationship between Maxim Group, Morgan Keegan, and Greenberg Traurig, as discussed' in detail above, we conclude that the impression of bias arising from that relationship is direct, definite, and capable of demonstration. Waverlee Homes, supra.
Accordingly, we conclude from the admissible evidence discussed above that the Fund has established an evident partiality on the part of Kunis under 9 U.S.C. '§ 10(a)(2) ahd that the Fund is entitled to -have the judgment entered on the arbitration award vacated. Because we have found an evident partiality as to Kunis, we pretermit discussion as to whether the Fund demonstrated an evident partiality as to Julavits.
“A finding of evident partiality in one arbitrator generally requires vacatur of the arbitration award. As stated in Wheeler v. St. Joseph Hospital, 63 Cal. App.3d 345, 133 Cal.Rptr. 775 (1976): ‘The arbitrators are not isolated from each other; they hear and decide the case - as a panel after joint discussion, debate and deliberation. Each panel member has an opportunity to persuade the others.’ 133 Cal.Rptr. at 793. Thus, notwithstanding a majority of an arbitration panel is required to enter any arbitration award, when one arbitrator is evidently partial, the panel’s *925 award must generally be suspect. This conclusion holds particularly when the other panel members vote with the evidently partial arbitrator, as will be the case in most awards that are later challenged.”
Schmitz, 20 F.3d at 1049.

Conclusion

We reverse the judgment' of the trial court denying the Fund’s motion to vacate the judgment entered on the arbitration award and remand the case for proceedings consistent with this opinion. • Because we have found that evident partiality exists as to Kunis under 9 U.S.C. § 10(a)(2), we pretermit discussion of the remaining issues raised by the Fund. .
REVERSED AND REMANDED.
STUART, PARKER, SHAW, MAIN, WISE, and BRYAN, JJ., concur.
MURDOCK, J., concurs specially.*
MOORE, C.J., concurs in the result.

. MAM and' Morgan Keegan specifically excluded from their objection the FINRA Rules, the FINRA arbitration guide, "and things of . that nature."

. Although MA’M and Morgan Keegan have not disputed the contents of those documents, they have vigorously, challenged their eviden-tiary significance.

. Federal cases construing the Federal Rules of Evidence are considered persuasive authority for Alabama state courts construing the *910 Alabama Rules of Evidence. See Williams v. Harris, 80 So.3d 273 (Ala.Civ.App.2011).

. Rule 201, Ala. R. Evid., was adopted verbatim from the corresponding Federal Rulé of Evidence dealing with judicial notice of adjudicative facts. Advisory Committee’s Notes, Rule 201, Ala. R. Civ. P. -

. The Schmitz decision will be discussed in detail, infra, because the Fund relies on that decision in support of its argument that the law will impose constructive knowledgé of dny undiscovered conflict upon the arbitrator where the arbitrator has a’ duty- to" discover possible conflicts and does nothing to fulfill that duty.

. The NASD was the predecessor to FINRA.